**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Master File No. 1:15-cv-00679-MSK-KMT

RONALD LORUSSO, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

BOULDER BRANDS, INC.,
STEPHEN B. HUGHES,
JAMES B. LEIGHTON and
CHRISTINE SACCO,

Defendants.

---

**LEAD PLAINTIFF'S CONSOLIDATED CLASS ACTION COMPLAINT**

---

By and through its undersigned counsel, Lead Plaintiff Oklahoma Police Pension & Retirement System ("Plaintiff") alleges the following against Defendants Boulder Brands ("Boulder" or the "Company"), Stephen B. Hughes ("Hughes"), James B. Leighton ("Leighton"), and Christine Sacco ("Sacco") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Boulder and other non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other non-parties; (c) review of news articles; (d) review of other publicly available information concerning Boulder, the other Defendants, and non-parties; and (e) interviews with factual sources, including individuals formerly employed by Boulder. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a federal securities class action against Boulder and certain of its officers and directors for violations of the federal securities laws. Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of itself and all persons or entities who purchased or acquired shares of Boulder common stock (the "Class") between December 23, 2013 and October 22, 2014, inclusive (the "Class Period"). Plaintiff alleges that during the Class Period, Defendants engaged in a fraudulent scheme to both misrepresent and conceal the true operational and financial condition at the Company and thereby artificially inflated the price of Boulder stock.

2. The falsity of Defendants' Class Period statements is made clear by two admissions. ***First***, during a conference call on November 6, 2014, Defendants told investors for the first time that Boulder, a company that made and sold consumer food products,[1] ***did not "even have a warehouse management system***" at a key storage and distribution center used by the Company for certain of its food products and that, consequently, Boulder had "shorted" customer orders and "***did not have the capacity and capability to get enough orders out of that facility, which impacted all of our customers***, ***including [Boulder's largest customer] UNFI***."[2] Defendants further informed investors that day that the Company had failed to adequately integrate key acquisitions, and stated that "***putting these four businesses together and trying to get them on a platform for this kind of rapid growth was too ambitious, and it caught us***." These admissions directly contradicted Defendants' Class Period statements that Boulder had fully resolved prior customer service and shorting issues that had plagued the Company in 2013, that it had successfully and fully integrated acquisitions in its Natural segment – which was of critical importance because the Natural segment was poised to be an area of rapid growth for the Company during the Class Period and beyond – and that the Company had "low-hanging fruit" margin improvement projects that would sequentially boost profit margins and financial results in 2014 and beyond.

3. These admissions provided clarity to the market regarding why the Company had failed to grow at the rate necessary to achieve Defendants' touted guidance and gross profit metrics,

---

[1] On January 15, 2016, Boulder was acquired by Pinnacle Foods, Inc. ("Pinnacle Foods") for $975 million. Under the terms of the acquisition, Pinnacle Foods subsequently launched a tender offer to acquire all the outstanding shares of Boulder.

[2] UNFI, or United Natural Foods, Inc., is the leading national distributor of natural and organic foods, specialty foods, and related products in the United States and Canada. At all relevant times, UNFI was Boulder's largest and most important customer.

and made clear that the Company's future financial outlook was materially undermined by these problems.

4. ***Second***, on November 24, 2015, Robert Gamgort ("Gamgort"), the CEO of Pinnacle Foods, spoke during a conference call to address Pinnacle Foods' just-announced acquisition of Boulder. Discussing Boulder's critically important "foundation" Smart Balance brand, Gamgort stated that there had "been a ***dramatic reduction in support behind this brand"*** by Boulder, that Pinnacle Foods would "restor[e] some support to it," and that ***support for Smart Balance had "been pulled very dramatically in the past number of years***." These statements stand in stark contrast to, and directly undermine Defendants' Class Period statements that they would continue to support Smart Balance and work to stabilize and revitalize the key line of products, and that reduced marketing spend in favor of social media advertising would not harm Smart Balance during the Class Period.

5. Throughout the Class Period, Defendants' numerous misrepresentations, including repeated confirmations of earnings per share estimates premised on improvements in gross margin during 2014, had their intended effect and Boulder stock traded at artificially inflated prices, reaching a high of $17.94 on April 2, 2014.

6. On October 22, 2014, however, Boulder issued a press release providing an update on its anticipated third quarter 2014 financial results and its outlook for the fourth quarter 2014. The Company shocked the market by reporting that anticipated financial results would fall well short of Defendants' repeatedly confirmed financial guidance and gross margin metrics. The Company blindsided investors with a diluted loss per share for the third quarter 2014 of ($2.12) as a result of significant impairment charges totaling $147.5 million in the Company's Balance segment. Even

excluding that impairment, the Company reported non-GAAP diluted earnings per share for the third quarter 2014 of approximately $0.08 – significantly below prior guidance of $0.10 to $0.12. For the fourth quarter 2014, Defendants revealed that non-GAAP diluted earnings per share would also come in well below prior guidance, with results expected to be in the range of $0.04 to $0.06 compared to prior guidance of $0.18 to $0.20.

7. The Company's October 22, 2014 press release quoted Boulder CEO Hughes as stating:

> During the third quarter, we faced a number of headwinds that impacted our financial results. Smart Balance continued to face challenges in the spreads category, resulting in a larger than expected decline. In addition, as noted on our second quarter call, the mix shift of our fast-growing, lower margin Natural segment is significantly outpacing our higher margin Balance segment and is therefore putting increased pressure on our gross margins.
>
> While we are disappointed with our results, consumption is in line with our guidance and tracking ahead of sales, which is a positive indicator for the health of our business. We expect consumption in the fourth quarter to be in line with the third quarter, but are expecting lower shipments due to a normalizing of certain inventories at our largest customer. We look forward to detailing our strategy and outlook for the fourth quarter and 2015 on our upcoming earnings call.

8. The press release concluded by stating the Company was going into a "quiet period" until reporting its third quarter results on November 6, 2014.

9. As the market reacted to the disclosures in the press release, the price of Boulder Brands stock collapsed nearly ***24%***, falling from a closing price of $12.73 on October 21, 2014 to close at $9.62 on October 22, 2014, on abnormal trading volume of more than 9 million shares traded. The next day, the stock dropped an additional 6.55%, closing on October 23, 2014 at $8.99, on volume of more than 5.3 million shares traded.

10. When the Company issued its final earnings press release and hosted its earnings conference call on November 6, 2014, Defendants admitted to undisclosed facts and shed additional light on the Company's true financial condition and weakened outlook. Specifically, Defendants revealed that gross margin ***declined*** from 2013 levels to 37.7%, well short of the 41% Defendants repeatedly touted would be achieved by year-end 2014. And, as set forth above, Defendants also admitted during a conference call that day to ongoing operational shortcomings that directly and negatively impacted the Company's financial performance and outlook.

11. The price of Boulder stock did not recover. Indeed, other troubling facts about Boulder reached the market following the close of the Class Period. For example, on June 10, 2015, Boulder announced that Defendant Hughes, the Company's co-founder and CEO, abruptly quit, effective the day before, as both a director and CEO. The Company also revealed that sales would miss second quarter 2015 targets, with net sales ***dropping*** 5% to 7% compared to the second quarter of 2014 and sales in the Balance segment plunging about 16% to 18% from a year earlier. The June 10, 2015 announcement stated that Defendant Leighton, the Company's then-Chief Operating Officer ("COO") would serve as interim CEO effective June 9, 2015. Commenting on Hughes' sudden resignation, Dean Hollis, Chairman of the Boulder Brands Board of Directors, stated, in part:

> The Board believes now is the time for new leadership at Boulder Brands. This change, along with the evolving dynamics of our industry, gives us confidence that we are well-positioned to leverage customer and consumer desires for authentic and scalable natural brands to deliver sustainable results and generate meaningful value creation. We are confident that Jim Leighton, a highly respected executive with decades of leadership experience across the industry. . . will provide the immediate leadership necessary to deliver on our commitments to our key stakeholders.

12. The Company's June 10, 2015 press release also quoted Defendant Leighton as stating, in relevant part: "One critical objective is to refocus our spending priorities towards

consumer marketing programs that will more effectively introduce our brands to a broader base of consumers and better support these brands as distribution gains continue." In response, the price of Boulder Brands common stock dropped 22%, falling to a three-year low.

13. Then, on July 8, 2015, the Company announced it was cutting 15% of its salaried employees as part of a restructuring, and that the bulk of the cost savings would be used for "enhanced marketing" designed to boost sales of its core products. Describing the significant layoffs and restructuring, Defendant Leighton stated, in part: "This strategic alignment is an important ***first step*** toward implementing meaningful change across Boulder Brands. Through this right-sizing of our organization, we are creating a more streamlined and integrated platform that will reduce administrative costs and allow us to focus our spending priorities towards innovative consumer marketing programs. Our objective is to more effectively introduce our brands to a broader base of consumers and better support these brands as distribution gains continue." In a press release describing the restructuring, Boulder stated that the changes would "better align functional teams, improve the Company's operational effectiveness and deliver improved and consistent results."

## II. JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

15. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b). Many of the false and misleading statements were made in or issued from this District. Boulder's principal executive offices were located at 1600 Pearl Street,

Suite 300, Boulder, Colorado 80302, and many of the acts and transactions giving rise to the violations of law complained of occurred in this District

16. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

17. Plaintiff was appointed to serve as Lead Plaintiff in this action by Order of this Court dated March 2, 2016 [Dkt. No. 36]. As shown in its certification filed with the Court on June 1, 2016 [Dkt. No. 30-2] and incorporated herein, Plaintiff purchased Boulder common stock at artificially inflated prices during the Class Period and suffered an economic loss when the true facts about the Company's business and financial condition were disclosed and the stock price resultantly declined.

### B. Defendants

18. Defendant Boulder was a Delaware corporation with principal executive offices located at 1600 Pearl Street, in Boulder, Colorado.

19. Defendant Hughes was the CEO and a director of Boulder during the Class Period and until June 10, 2015, when he resigned and left the Company.

20. Defendant Leighton was, at all relevant times, COO of Boulder and served as the Company's Interim CEO beginning on June 10, 2015, when Defendant Hughes resigned.

21. Defendant Sacco was, at all relevant times, the Chief Financial Officer ("CFO") of Boulder.

22. Defendants Hughes, Leighton and Sacco are collectively referred to herein as the "Individual Defendants."

23. During the Class Period, the Individual Defendants, as senior executive officers of Boulder, were privy to confidential and proprietary information concerning Boulder, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Boulder, as discussed in detail below. Because of their positions with Boulder, the Individual Defendants had access to non-public information about Boulder's business, finances, products, markets, and present and future business prospects *via* access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Boulder's business.

25. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions with Boulder, each of the Individual Defendants had access to the adverse undisclosed information about Boulder's business prospects, financial condition, and performance as particularized herein, and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about Boulder and its business issued or adopted by the Company materially false and misleading.

26. The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

27. Each of the above officers of Boulder, by virtue of his/her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. These Defendants were involved in drafting, producing,

reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

28. As senior executive officers and as controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ Stock Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Boulder's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Boulder common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of publicly-traded Boulder common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Boulder's business, operations, management, and the intrinsic value of Boulder common stock and caused Plaintiff and other members of the Class to purchase Boulder common stock at artificially inflated prices.

30. Defendants are liable for: (i) making false statements; and/or (ii) failing to disclose adverse facts known to them about Boulder. Defendants' fraudulent scheme and course of business

that operated as a fraud or deceit on purchasers of Boulder common stock was a success, as it: (i) deceived the investing public regarding Boulder's prospects and business; (ii) artificially inflated the price of Boulder common stock; and (iii) caused Plaintiff and other members of the Class to purchase Boulder common stock at inflated prices.

## IV. SUBSTANTIVE ALLEGATIONS[3]

### A. Background of the Company

31. The Company was founded by Defendant Hughes and was originally incorporated under the name Boulder Specialty Brands, Inc. in Delaware on May 31, 2005, to serve as a vehicle for the acquisition of businesses in the consumer food and beverage industry. On May 21, 2007, the Company completed a merger with GFA Brands, Inc. ("GFA"), which owned and marketed the Smart Balance line of products, among others, and GFA became a wholly-owned subsidiary and one of Boulder's operating entities. After the merger, the Company changed its name to Smart Balance, Inc., after its flagship line of products.

32. Smart Balance food products do not contain hydrogenated or partially hydrogenated oils and are naturally trans-fat free. The products include spreadable butter substitutes, enhanced milks, peanut butter spreads, cooking oils and sprays, popcorn, and light mayonnaise dressing products all marketed under the Smart Balance brand name. Between 2009 and 2011, Smart Balance labeled products represented between 89% and 77%, respectively, of the Company's sales. Smart Balance products sold at a very high profit margin and were, put simply, a cash cow that was critical to the Company's financial success.

[3] Internal citations and quotations are omitted and emphasis is added unless otherwise stated.

33. While still operating as Smart Balance, the Company undertook a series of acquisitions, including Glutino Food Group; Udi's Healthy Foods, LLC ("Udi's") – a specialty food company focused on gluten free produces; Davies Bakery, based in the UK; and GlucoBrands LLC, among others. The acquisition of Denver-based Udi's for $125 million in June of 2012 made the Company the fourth-largest seller of natural foods.

34. Then, in January 2013, the New Jersey based Smart Balance rebranded itself by changing its corporate name to Boulder Brands Inc., and in October of the same year, moved its corporate headquarters to Boulder, Colorado, as part of a reorganization that split the company into two units, Smart Balance and Natural.

35. On December 23, 2013, the start of the Class Period, Boulder completed another acquisition, when it acquired 100% of the equity interest of Phil's Fresh Foods, LLC, owner of EVOL Foods, or "EVOL." Also based in Boulder, Colorado, EVOL manufactures and markets frozen foods with a focus on simple ingredients. EVOL's products include those that are antibiotic-free, hormone-free, GMO-free, and have no artificial preservatives or flavors.

36. On February 10, 2014, the Company announced that it had completed the move of its corporate headquarters to Boulder, Colorado and that it would relocate its Finance and Operations leadership to Boulder as well, with the business service center to remain in Paramus, New Jersey. In addition, the Company announced that it redefined its reportable segments from the Natural and Smart Balance segments to Natural and Balance, aligning it with the way the Company had begun to operate its business. This change in segments eliminated the roles of Chief Innovation Officer and Executive Vice President for Smart Balance.

37. The Natural segment included gluten free bread and baked goods, and frozen pizza and granola under the Udi's brand name, shelf stable and frozen gluten free products, including snack foods, frozen baked goods, and baking mixes organized under the Glutino brand name, and burritos, meals, and quesadillas manufactured and operated under the EVOL brand name.

38. The Balance segment offered buttery spreads, buttery sticks, nut butters, vegan snack items, and vegan mayo dressings under the Earth Balance brand name; spreadable butters, enhanced milks, peanut butter spreads, cooking oils and sprays, popcorn, and light mayonnaise dressing products under the Smart Balance brand name, and diabetic-friendly food products, including glucose gels, bars, shakes, and decadent snacks under the Level Life brand name.

**B. The Company Shifts Its Focus and Culture**

39. Boulder's acquisitions of food companies in the Natural segment, reorganization into the Natural and Balance operating segments, and its move from New Jersey to Colorado represented a shift in the Company's focus and corporate culture. Not only did the Company move away from its lifelong headquarters, but unbeknownst to the market, it dramatically pulled support away from its critically important Smart Balance line of products, which had been the Company's main profit engine since Defendant Hughes founded the Company in 2005. In place of Smart Balance, the Company devoted more of its resources to its lower margin Natural segment while assuring investors the Company could take advantage of "low-hanging fruit" margin improvement efforts that would drive profitability even as the Company integrated acquisitions, introduced new products, and worked to expand its distribution.

40. Indeed, Smart Balance comprised almost 40% of the Company's net sales in 2013, which dropped to closer to 30% in 2014. But, during the Class Period, Defendants reassured

investors throughout the Class Period that the Company was committed to maintaining strong profitability, "stabilizing our spreads business" and that despite utilizing decreased marketing spend on Smart Balance by shifting from traditional advertising to social media campaigns, the Company would not put the "trend line at risk."

41. What Boulder investors did not know, and as has now been admitted by the CEO of Pinnacle Foods, was that during the Class Period, Defendants were "dramatically" removing critical support from Smart Balance.

42. Further harming Smart Balance was the fact that Boulder was shifting its focus to products that Defendants considered appealing to younger "millennial" consumers, such as Udi's, Glutino, and EVOL. Although those brands could be successfully marketed through alternative methods such as social media and grassroots efforts, Smart Balance's target demographic was the Baby Boomer generation.[4] Despite this fact, Defendants cut Boulder's marketing spend on Smart Balance in an effort to market through social media. By pulling traditional marketing spend from Smart Balance, Defendants knew they were effectively abandoning Smart Balance during the Class Period and that it was extraordinarily unlikely that its sales would be stabilized during the Class Period and into the future. Rather than admitting to investors that Boulder was "dramatically" pulling support from Smart Balance (as Gamgort immediately admitted upon Pinnacle Foods' acquisition of Boulder), Defendants misled investors into believing the Company was actively working to stabilize Smart Balance sales and maintain its profitability.

[4] During a conference call on September 3, 2014, Defendant Hughes went so far as to refer to Smart Balance customers as an "older, aging, dying user group."

43. As a result, Defendants knew or recklessly disregarded that Smart Balance sales would rapidly decline, rather than stabilize. When Defendants could hide the truth no longer, on October 22, 2014, Boulder announced a larger than expected decline in Smart Balance sales, as well as impairment charges aggregating $147.5 million relating to the Smart Balance business.

**C. The Company Struggles to Integrate Acquisitions and Manage Production and Inventory**

44. Leading up to the start of the Class Period, Boulder experienced serious customer service disruptions resulting in supply shortages in several of the Company's product platforms. At the start of the Class Period, however, Defendants assured investors that the customer service issues Boulder experienced in 2013 were a thing of the past and that the Company had brought its customer services levels up to a high standard. For example during a conference call hosted by the Company on February 27, 2014, Defendant Leighton stated:

> We really have a four-phased approach. The first one is: In the second half of last year, we had to get our arms around -- quickly around customer service. ***So, we built up the capabilities and capacities to support that. And happy to tell you now that we have customer-service levels where they need to be.***

45. Defendant Hughes confirmed that the Company's customer service levels had been upgraded and would no longer hurt Boulder's delivery of product to customers or the Company's profitability, stating:

> The beautiful thing is: Jim and the team have done a fabulous job. ***We really have seen our service levels get back to the standard we want to see over the last month and a half. So, we don't think the shorting issue's going to be there going forward.***

46. Similarly, during a conference call hosted by the Company on May 8, 2014, Defendant Leighton reaffirmed the efficiency of Boulder's customer service and stated:

> We've already gained significant ground in this endeavor. Regarding our new Denver Florence Street facility. ***We've made tremendous progress stabilizing***

> ***customer service. We are now at or above targeted service goals.*** *We're also making progress in driving operational improvements in yield, efficiencies and quality across all of our facilities.*[5]

47. In addition, throughout the Class Period, Defendants represented to the market that the Company was growing, its Natural products were in high demand, and its margin improvement projects would result in increased margins in the back of the year, reaching 41% by year-end 2014.

48. Behind the scenes, however, Boulder's reorganization and rapid expansion through acquisitions created serious problems for the Company. Defendants struggled to integrate the newly acquired companies and to manage the introduction of a vast number of new products. Boulder's processes – from product development, manufacturing, inventory management and shipping – were ineffectual, resulting in overproduction of some inventory, lack of other inventory, and significant customer service issues that Defendants had previously described as a thing of the past.

49. Boulder perpetuated the appearance of growth by overproducing and overloading customers with extra volume of Natural products.

### 1. Boulder's EVOL Manufacturing Facility and Personnel Were Pushed to Their Limit and Were Overproducing

50. During the Class Period, Boulder's Range Street manufacturing facility, which produced the Company's EVOL products, was operating beyond its theoretical maximum capacity, a daily efficiency measure for production. The facility, located in Boulder, Colorado, had not originally been designed to produce food and had many limitations that hampered the Company's ability to grow and meet demand. For instance, the facility was mold-infested and had almost no

---

[5] The Florence Street facility was a manufacturing facility located on Florence Street in Aurora, Colorado, utilized by Boulder to manufacture certain of its gluten-free products during the Class Period.

storage, especially cold storage, utilizing only a small freezer that was the size of a modest bedroom. The small EVOL facility couldn't keep up with the Company's production goals, which, for a given day, were set forth in a MRP (an acronym for materials planning requirements), Excel spreadsheet prepared at Boulder's corporate office.

51. During the Class Period, the theoretical maximum capability of production at the Range Street facility had been 60 units of product per minute, but the facility had been close to running at 100 units per minute, and was being pushed to make more. In addition to being pushed to make more products, the EVOL plant was in constant development and production of new products. As a result, the Range Street facility was over-worked and over-producing, causing the supply chain for the Range Street facility to break down as production was generated well past its theoretical maximum capacity.[6] The increase in production was at the expense of mechanical and logistical problems, including issues with machines that had been worked too hard and overheated, as well as delivery of the wrong ingredients, or the wrong ratio of ingredients, so that products could not be produced.

52. The pressure to produce more products sometimes caused the Range Street facility to exceed its production capabilities for one product at the expense of meeting production goals for other products. For example, while the goals for producing a certain number of burritos might be achieved, only half the production of bowl products would be achieved in that same timeframe. The result was the Company, contrary to Defendants' Class Period statements, was operating unevenly

[6] Production at the Range Street facility was virtually constant, with EVOL products being produced in two shifts, with the first shift working during the day and the second shift working during the evening hours. The second shift was required to work 12-hour shifts seven days in a row for many weeks during the Class Period in order to achieve the high level of production that Boulder required.

and unpredictably in terms of production, inventory management, and ability to adequately service its customers.

### 2. A Key Storage Facility Utilized By Boulder Did Not Have an Inventory Management System

53. Products manufactured at Boulder's Range Street facility were transported in truck trailers to a third-party cold storage warehouse and distribution center called Oneida, located in Denver. Conversely, the Oneida facility was also responsible for storing and shipping raw materials to the Range Street facility to be used in manufacturing EVOL products. But, as admitted by Defendants on November 6, 2014, this key facility responsible for storing and shipping products and raw materials for Boulder's critically important Natural segment lacked a warehouse management system during the Class Period.

54. The lack of a warehouse management system at the Oneida facility resulted in significant supply chain and inventory management problems for both raw materials and finished products during the Class Period, creating customer service issues that resulted in the inability to fulfill orders, *i.e.*, shorting.

55. On a daily basis, the Range Street facility produced enough finished EVOL products to fill several trailers, which were transported to the Oneida facility. But, Oneida's lack of warehouse inventory management systems was frequently a problem. Indeed, in one instance, the Range Street facility had to halt production because the Oneida facility no longer had room for additional EVOL products. The Range Street facility had overproduced to such a high degree that there was a running joke in the Company that EVOL was producing products in anticipation of the end of the world or the zombie apocalypse, because there was so much inventory in the Oneida warehouse.

56. Compounding the problems associated with both uneven production and the overproduction of certain products was the fact that there were also problems getting raw materials from the Oneida warehouse to the Range Street plant. There were times when raw materials shipped from Oneida to the Range Street facility were incorrect, insufficient, or not available, and it was difficult to get accurate quantities of the materials that were needed for production. This problem was further complicated by the fact that Oneida provided the freight by which the raw materials were transported to the Range Street facility. Therefore, due to the lack of a warehouse management system at Oneida, Boulder was unable to deliver to Range Street the materials that it needed to produce products in order to accurately meet customer demands and orders for EVOL products.

57. During the Class Period, the lack of basic warehouse management systems at the key Oneida storage and distribution facility used by Boulder for Udi's and EVOL products, combined with overproduction of products and the rapid introduction of a number of new products, resulted in significant customer service issues that Defendants represented were behind the Company at the end of 2013. These problems also served to prevent the Company from being in a position to rapidly improve margins or attain its financial guidance issued during the Class Period.

58. Despite these obstacles, Defendants consistently touted a wide-range of margin-improvement initiatives as "low hanging fruit," referring to goals they deemed easily achievable and not requiring significant effort to accomplish. In reality, these margin improvement opportunities were not simple or easy to achieve and, in fact, Defendants failed to attain most of these goals.

59. For example, among Boulder's margin improvement projects, Defendants emphasized building up customer service and capacity, improving all of Boulder's facilities, and reducing inefficient trade and coupon spending. Boulder revealed at the end of the Class Period,

however, that its production capacity and improved customer service were negatively impacted by the lack of a basic warehouse management system at a key storage and distribution facility used by Boulder, resulting in a shortage of products to key customers. Further, the Company's manufacturing facilities remained small and ill-equipped to meet production goals. In addition, while Boulder's reduction in trade spend may have saved on costs, it resulted in reduced sales. Contrary to Defendants' assertions, the veritable "low-hanging fruit" margin improvement projects extolled by Defendants during the Class Period were patently unattainable while the Company waded through significant acquisition and expansion related growing pains.

## D. Numerous Facts Support Defendants' Knowledge of the Company's Undisclosed Financial and Operational Problems

60. Defendants knew of, or at a minimum, were severely reckless in disregarding, the undisclosed problems caused by the Company's acquisition of new companies, lack of inventory management at a key storage and distribution facility and overproduction, as well as the conscious decision to turn away from its high margin Smart Balance products, rendering the Company unable to meet, among other things, its repeated margin projections of 41% by year end. This is supported by numerous additional indicia of Defendants' knowledge, including Defendants' intimate involvement with meetings discussing the Company's profitability, among other things, their own Class Period statements, and the fact that such issues affected core operations of the Company.

### 1. Company Meetings, the Individual Defendants Were Aware of and Responsible for the Desperate Measures Taken to Try and Meet Revenue Goals

61. Defendant Leighton participated in bi-monthly meetings with the Vice President of Operations, Kyle Heberle, a Quality Assurance manager, and a Human Resources Manager. The

meetings, which lasted anywhere from 1-3 hours, were always held on Wednesday mornings in a conference room at the Boulder office located on Pearl Street in Boulder, Colorado.

62. The meetings focused on several "Ps," including "product, people, profitability," as well as "planet," which addressed environmental issues such as recycling. Among other things, presentations were made during the meetings pertaining to the level of production attained by the Range Street facility.

63. Profitability was the most important issue discussed during the meetings, but personnel retention was also important because the Range Street facility had large turnover.

### 2. Defendants' Own Public Statements Confirm Their Knowledge of the Company's Problems

64. Defendants made numerous public statements in which they discussed the Company's acquisition and product-fueled growth strategy, its Balance and Natural products and the margin improvement initiatives. In fact, Defendants were asked and answered detailed questions about at least one of those matters during every quarterly earnings call with securities analysts throughout the Class Period. In particular, Defendants boasted of the Company's margin improvement projects, the focus on stabilizing and revitalizing Smart Balance, the decision to save costs by reducing marketing and trade spend while preserving sales, and their clear ability to increase margins to 41% by the end of 2014. Defendants echoed these statements in numerous press releases and SEC filings of the Company. These statements evidenced Defendants' personal knowledge of such matters.

### 3. The Company's Problems Involved Core Operations of the Company, Further Supporting Defendants' Knowledge

65. Similarly, Defendants' knowledge is further supported by the fact that the operating problems involved the Company's core operations, including its Balance and Natural segments, its

growth strategy via new acquisitions, and margin improvement projects, which were vital to the Company. This is evidenced by Defendants' own public statements emphasizing the importance of such products, margin improvement projects and trade spend, and the fact that, as discussed above, these matters were frequent and repeated topics of discussion throughout the Class Period.

66. During the Class Period, the Individual Defendants were the highest-ranking officers of the Company (Defendant Hughes was CEO, Defendant Leighton was CFO and Defendant Sacco was COO). Thus, Defendants were heavily involved with such core operations and their involvement supports an inference that they knew or recklessly disregarded material problems affecting the Company and the impact of such problems on the Company's financial results and prospects.

## V. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

67. Throughout the Class Period, Defendants repeatedly made positive statements about the Company's growth, successful integration of acquisitions, resolution of customer service shortcomings, commitment to stabilizing and revitalizing Smart Balance sales and profitability, and margin improvement projects, affirmatively representing that they would positively impact the Company's margin and financial results in the back half of the year. However, these statements did not paint a complete and accurate picture of Boulder's operations under the circumstances. In reality, Defendants knew or recklessly disregarded that Boulder was having difficulty integrating its acquisitions, had drastically reduced support for Smart Balance, was overproducing products, and that a key storage and distribution facility used by Boulder for Udi's and EVOL products lacked critical warehouse management systems to effectively monitor production and distribution of products, which would lead to an inability to fulfill customer orders. When Defendants elected to

disclose positive information about the Company during the Class Period, they were under a duty to disclose the omitted negative information about the Company, its operations, financial condition, and products in order to make the positive information not misleading. This omitted information would have altered the total mix of information for reasonable investors and removed the artificial inflation from the price of Boulder stock.

### A. Defendants' False and Misleading Statements and Omissions from December 23, 2013 through May 7, 2014

68. The Class Period begins on December 23, 2013, when Boulder issued a press release announcing its acquisition of 100% of the equity interests of Phil's Fresh Foods, LLC, owner of EVOL, for $48 million in cash. The press release highlighted Boulder's expectations related to the acquisition:

> *For 2014, the Company expects EVOL to contribute approximately $25 million in net sales and, given EVOL is in its early stages of growth, EVOL is expected to generate $1.5 million in estimated EBITDA. On a GAAP basis, EVOL is expected to be dilutive to earnings per share by approximately $0.02 per share in 2014.*
>
> *As a result, **the Company expects 2014 sales to be in the range of $540 million to $550 million (previous range of $515 million to $525 million); adjusted EBITDA to be in the range of $89 million to $94 million (previous range of $87 million to $92 million) and earnings per share to be in the range of $0.41 to $0.46 (previous range of $0.43 to $0.48)**.*

69. On the morning of February 27, 2014, the Company issued a press release announcing its financial results for the fourth quarter ended December 31, 2013, which reiterated the Company's outlook for 2014 and provided a narrowed EPS outlook for 2014. Among other things, the press release stated:

> ***For 2014, the Company continues to expect net sales to be in the range of $540 million to $550 million**, **EBITDA to be in the range of $80 to $85 million, and adjusted EBITDA to be in the range of $89 million to $94 million. In addition, the Company updated its earnings per share outlook to be in the range of $0.39 to***

> ***$0.44, compared to the Company's initial estimate of $0.41-$0.46, to reflect updated estimates for stock-based compensation and depreciation and amortization**.*

70. In the February 27, 2014 press release, the Company assured investors that gross margin would improve as 2014 progressed and stated, in relevant part:

> ***Gross profit margin for the year is expected to be in the 37% to 42% range as strong growth in the Natural segment will impact overall gross margin. In addition, the Company believes the impact from higher commodity prices and lower utilization will impact the gross margin more significantly in the earlier quarters and improve sequentially throughout 2014.***

71. On the same day, the Company hosted a conference call to discuss the Company's fourth quarter 2013 results. Defendants Hughes, Leighton and Sacco participated in the call on behalf of the Company, as did Carol Buyers, ("Buyers") Boulder's Senior Vice President of Investor Relations and Business Development. During the call, Hughes discussed the Company's focus on Boulder's Smart Balance line of products:

> ***In summary, our strategy in the Smart Balance segment is to maintain strong profitability.*** As expected, with the transition to space-saver packaging behind us, consumption and net sales came into balance in the fourth quarter. Excluding the products we strategically exited, core Smart Balance category of consumption declined 7.4% while net sales declined 7.7%. Most importantly, we managed to grow brand profit 23% and the margin increased over 1,000 basis points in the quarter.

72. Sacco also commented on the Company's two segments and provided details regarding Boulder's financial guidance for 2014, stating, in part:

> Now, let me provide some specifics regarding our outlook for 2014. ***We expect overall net sales growth in 2014 to be in the 15% to 20% range versus 2013, and organic net sales growth to be in the 13% to 18% range.*** The organic growth calculation excludes the sales from milk and includes the sales from EVOL in 2013.
>
> ***We expect growth to be driven by the inclusion of EVOL on a full-year basis and continued growth in Udi's, Glutino, and Earth Balance.*** Total net sales growth in natural is estimated to be 35% to 40%. Organic net sales growth in natural, which assumes we owned EVOL in both periods, is estimated to be 25% to 30%.

> ***Total net sales for the Balance segment are expected to be in the range of a low single-digit decline to a low single-digit increase***. Organic net sales for the Balance segment, excluding sales of milk in 2013, are expected to increase in the low single-digit range. ***Gross profit margin for the year is expected to be in the 37% to 42% range, as strong growth in the natural segment will impact overall gross margin.***

73. Hughes next discussed "six key strategies for 2014," which included, among other things, a focus on Smart Balance. More specifically, Hughes stated, in relevant part:

> ***Third, we'll focus on stabilizing our spreads business while maintaining strong profitability in this segment.*** Over the last two years, we have exited what were no longer a strategic brand in Best Life. We licensed a business that was not profitable with milk. And we introduced into a new category that was growing with spreadable butter.
>
> We also took leadership by addressing the retailers' biggest issue in the dairy case, which is limited space in the store and the warehouse with the space-saver packaging. ***This year, we'll continue to focus on profitability while further innovating and differentiating Smart Balance spreads***. And all I can say on this at this point is to stay tuned.
>
> ***Fourth, we'll continue to leverage the strength we are seeing in the Smart Balance brand through broader distribution, retail store expansion, and entering the new products and categories.*** As I mentioned, Earth Balance has been the big beneficiary of the space-saver packaging initiative.
>
> * * *
>
> And, finally, ***we expect to make investments to support the overall goal of ensuring greater operational capacity and efficiencies across the organization, and ultimately improving gross margins.***
>
> As I mentioned in Q4, ***we initiated a comprehensive strategic review to ensure we have the integrated strategies, processes, and operations in place to keep up with our growth, and then take steps to ensure we have the people end of the structure to keep pace. Jim Leighton, our COO, is leading this initiative, and I'm very encouraged by the progress on this project and the potential benefits as we move through 2014 into 2015. Jim has identified specific platforms and has hired an expert outside consulting firm to help us develop our long-term manufacturing plan, with the goal of ensuring the most optimal and low-cost production of our brands, products, and platforms.***

74. Among other initiatives Hughes discussed was the improvement of ***"overall long-term profitability through near-term sustainable margin improvement investments in 2014."***

75. When an analyst inquired about the factors that gave Defendants "confidence" in Boulder's "sequential steady [margin] improvement as we move through the year," Hughes, Leighton, and Sacco each responded and stated in relevant part:

> [Defendant Hughes:] There are really three things. The real big impact to the fourth quarter, and to some extent the first quarter, is going to be the launch expenses in the UK. And that's a strategic decision and investment, but that's probably half of the year-over-year difference.
>
> The second thing is: We are taking a price increase that will be effective March 1. Which will cover some of the issue on egg whites. ***But most importantly, and maybe let Jim talk to this, we have a lot of low-hanging fruit on margin improvement, and that work is really under way in a major way.***
>
> [Defendant Leighton:] We really have a four-phased approach. The first one is: In the second half of last year, we had to get our arms around -- quickly around customer service. ***So, we built up the capabilities and capacities to support that. And happy to tell you now that we have customer-service levels where they need to be.***
>
> The other is relative to non-capital-related items that we're working on in all of our facilities, and that's continuous improvement. So, we're bringing some new tools and so forth to the table to work on that.
>
> And then the third is: We are working on our co-pack and internal network, and optimizing what that looks like. So, the $20 million that Steve referenced earlier -- he referenced that we're going to make sure that we're ***investing in those sustainable proven product platforms which will significantly reduce cost of goods manufactured. It will increase quality. And it will also help us on the service side of our Business.***
>
> [Defendant Sacco:] ***But we are already seeing, in Q4, improvements in the Denver facility in terms of efficiencies; obviously, overhead absorption continues to come down as the volume increases. We're seeing increases in yield. We're seeing that even in Q1 versus Q4.*** And so, I think we feel very confident in our ability to offset the impact of the egg whites.
>
> [Defendant Hughes:] ***So, I think what you'll see over the next four quarters, eight quarters, is just continuing for us to dial this in with the scale. The nice thing we***

> ***have -- we have the scale. We've got volume now to really be able to leverage, whether it's automation or it's leveraging strategic sourcing of ingredients and such. Again, I think we feel pretty good that we're going to see real strong sequential improvement as we move quarter to quarter this year.***

76. When further pressed about Boulder's expected improvement in margins in the second half of the year and the Company's strategy for Smart Balance between the first and second halves of the year, Hughes described the Company's change in its marketing of Smart Balance:

> ***One thing on Smart Balance is we're going to be moving Smart Balance from what I would call conventional marketing model, which is 10%, 12% of net revenue kind of spending with mass TV advertising and a lot of FSI couponing, to really the Udi's marketing model, which is more in the 5% to 6% range***. So, that's one of -- that will be happening throughout the year.

77. Hughes also emphasized Boulder's enhanced levels of customer service as a factor in improvement in margins in the second half of the year, assuring investors that fulfilling orders would not be an issue for the Company in 2014:

> The beautiful thing is: Jim and the team have done a fabulous job. ***We really have seen our service levels get back to the standard we want to see over the last month and a half. So, we don't think the shorting issue's going to be there going forward***.
>
> And I keep telling everybody: ***The good news is, those things that hurt us in the third and fourth quarter are going to be in our comp coming up, so that's a good thing. But I think we're really getting pretty good visibility on the levers that are going to drive that margin up.***

78. Defendants reiterated that margins would continue to improve as the year progressed. For example, Sacco responded to a question concerning the 5% variance in forecasted gross margin, explaining ***"we do expect the first quarter to start out at the low end of the range, and as we work through the year, sequentially improving to end the year at the higher end of the range."*** Hughes then further explained ***"we've got pretty good confidence those levers are -- and that sequential improvement is going -- is very real."***

79. When an analyst expressed concern over the Company's decision to change the marketing strategy of Smart Balance and whether it would accelerate a decline of the brand, Hughes reassured the market that the change would not negatively impact sales, stating, in part:

> So, we have really seen -- we began to wind back that marketing strategy in the fourth quarter. We didn't really see any change in trend. We do have some news in the not-too-distant future we'll be talking about relative to Smart Balance that we're pretty excited about. But that is something that we want to do in the context of trying to bring a point of difference to the Business without -- while maintaining this profitability.
>
> ***The job of everyone at Smart Balance is maintain the profitability; if we can find a way to effectively change the trend line, we'll do that. We don't think we're putting the trend line at risk with this change in marketing strategy,*** because, quite honestly, the Udi's marketing strategy, while it's lower dollars, has proven to be extraordinarily effective in building that brand. And we're adding -- on Udi's we're up to about 1.7 million friends of Udi's through all the different social marketing models. We're adding 50,000 a month, with what is really a 5% or 6% marketing spend.

80. With regard to anticipated growth in margins for the Company's Natural products, including Glutino and Udi's, Hughes stated:

> We're going to review this next week in some detail, but at a high level, Glutino -- when we bought Glutino, it was 28% margin. Today we're at 36% margin. ***We think 40% is within reason there.***
>
> ***Udi's, we bought it at 40% margin, I think last quarter we were at 39% margin. We think, Chris, what, 45% on that?***

81. Sacco confirmed Hughes' projected margin growth stating ***"Absolutely. Udi's can grow to 45%."***

82. As the call continued, a KeyBanc Capital Markets analyst sought clarification regarding the "moving parts" in Boulder's guidance. The analyst asked why the Company would not "just lower the EBITDA guidance, and continue to spend as much as you were initially planning on marketing, given that obviously you're a growth company," and added "So, what am I missing

there?" The analyst further asked for Defendants to "help me isolate what exactly you're lowering in dollar terms from your previous expectation below the gross profit line, such that basically operating income adjusted is not really changing that much." In response, Sacco stated, in part:

> ***I think the biggest change, to your point, is really our marketing approach to the Balance segment.*** So, as you know, Duane Primozich comes in, and he's taken over Balance. Duane had run Earth Balance previously.
>
> And so, ***I think what we're seeing is Balance -- the Balance segment or Smart Balance brand being able to leverage the learnings from the Natural side of the business, as well as some of the social media platforms. And as Steve mentioned earlier, what we're seeing in terms of trends, we don't think vast marketing is the way to spend our dollars anymore.*** So, we think we're going to spend them more efficiently, and it's not about absolute dollars.

83. Adding to Sacco's response, Hughes provided further detail regarding the decision to lower marketing spend, stating:

> ***We really started that mid-third and fourth quarter from a spending level standpoint, and we really haven't seen any change in trend. I really don't think, in this particular category, on this particular brand, given the competitive set is also throttling back, that's really -- all those things line up.***
>
> ***And we think this is a more effective strategy, but it's not like we're changing our marketing strategy at the time when everybody in that category is reducing their absolute spend.***

84. On February 27, 2014, Boulder filed with the SEC its annual report on Form 10-K reporting its financial results for the fiscal year ended December 31, 2013. The Form 10-K omitted information regarding Boulder's significant withdrawal of support for Smart Balance and, instead, stated:

> ***We continue to focus on maintaining the profitability of our Smart Balance brand and have recently started licensing this brand in selected product areas and geographies in order to generate royalty income.***

85. The 2013 10-K also discussed marketing for Boulder's products and stated, in part:

> In the Natural segment, we use primarily in-store product sampling and online marketing. ***In the Smart Balance segment, we use primarily traditional marketing and advertising, such as freestanding newspaper inserts and coupons, and have been exploring alternative advertising vehicles as well.***

86. The 2013 10-K also discussed competition facing the Company and added that ***"[s]ubstantial advertising and promotional expenditures are required to maintain or improve a brand's market position or to introduce a new product."***

87. The Company's 2014 Form 10-K also contained certifications signed by Defendants Hughes and Sacco pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the Form 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," that the "information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company," and that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading."

88. The above statements from the Company's December 13, 2013 and February 27, 2014 press releases, the conference call on February 27, 2014, and the 2013 10-K filed with the SEC on February 27, 2014 were materially false and misleading and omitted material facts because:

(a) Defendants knew or recklessly disregarded that Boulder had dramatically withdrawn critical support for the Smart Balance line of products, as Gamgort would subsequently admit. As a result, Defendants' statements regarding the outlook for Smart Balance sales, their commitment to stabilize and maintain strong profitability in the brand, and their changes to the marketing approach for Smart Balance failed to paint an accurate picture of the then-current state of Smart Balance, as well as the future financial performance of the key brand;

(b) In the Company's Natural segment, a key storage and distribution facility used by the Company lacked a basic warehouse management system, as Defendants would later admit, leading to overproduction of inventory, raw material failures during production, and ongoing customer service issues, including an inability to accurately and timely distribute products to fulfill customer orders, including those of the Company's largest customer, UNFI;

(c) In light of the ongoing warehouse management and inventory problems that the Company experienced in its Natural segment, Boulder's customer service levels were not "where they need to be" and it was misleading for Defendants to state that "shorting" would not be an issue "going forward";

(d) As a result of the significant issues impacting the Company's Natural segment and the decision to withdraw support from Smart Balance, the "near-term" and "low-hanging fruit" margin improvement projects were illusory and Defendants' statements regarding Boulder's "very real" ability to achieve sequential margin improvement in 2014 lacked a reasonable basis when made;

(e) In light of the foregoing, Defendants' statements regarding the Company's 2014 financial guidance and outlook lacked a reasonable basis when made; and

(f) The Company's Form 10-K for fiscal year 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described herein.

**B. Defendants' Positive March Announcements and Analyst Reaction**

89. On March 3, 2014, Boulder announced that its key Smart Balance product was transitioning to a non-GMO product, "[f]ollowing an extensive revamp of ingredients sourcing and

manufacturing processes" and that a "full retain conversion to non-GMO Smart Balance spreads is expected by early summer." The Company announced in the press release that the switch to non-GMO would result in the conversion of more than 20 million pounds of oils to non-GMO.

90. On March 5, 2014, Boulder hosted its 2014 Analyst Day. During his remarks, Defendants Hughes stated to Boulder shareholders that the Company would "[c]onstantly deliver our commitments as we drive toward our goals and communicate transparently and authentically." Defendant Hughes further reiterated that one of the Company's priorities for 2014 was to ***"[r]evitalize our spreads business and increase SKU productivity while maintaining strong profitability."*** Later in the Analyst Day, Duane Primozich, the Executive Vice President of Balance Brands stated that for Smart Balance, the ***"headwinds [were] identified"*** and that a ***"revised course [was] chartered,"*** implying that Smart Balance would be stabilized going forward, and that ***"Smart Balance will transform the Spreads category to reflect consumer demand for pure and simple ingredients"*** while ***"re-assert[ing] category leadership."***

91. The statements identified above from the Company's 2014 Analyst Day on March 5, 2014 were materially false and misleading and omitted material facts because the Company was not revitalizing its spreads business – specifically Smart Balance – and was instead dramatically withdrawing support for the Smart Balance brand, as Gamgort would later admit.

92. Analysts were impressed with Boulder's presentations and expressed confidence in the Company's statements and outlook. For example:

(a) Canaccord Genuity responded to the presentations made by the Company by issuing a report on March 6, 2014 stating, in part:

> We came away from the analyst day more confident in the growth outlook and now believe that Boulder has under-earned the last couple of quarters despite meeting its

> sales and earnings guidance. We have always known that Boulder management was very adept at marketing, growing young brands and creating demand. However, *we now see operational management strength, supply chain management enhancement and a broader energetic/passionate team of VPs that are on a mission.*

(b) Similarly, William Blair & Company released a report on March 6, 2014 positively describing Boulder's analyst day presentations:

> Chief Operating Officer James Leighton provided a relatively upbeat progress report on fill rates and the prospects for productivity and, in turn, margin improvements over time. *Capacity constraints resulted in short shipments during the second half of 2013, although we understand fill rates have now recovered to targeted levels. . . . A full review of the supply chain and manufacturing architecture is still underway, although we understand productivity benefits should support sequential margin improvement throughout 2014.*

### C. Defendants' False and Misleading Statements and Omissions from May 8, 2014 through August 6, 2014

93. On May 8, 2014, Boulder issued a press release announcing the Company's financial results for the first quarter ended March 31, 2014. The Company reaffirmed its previously issued guidance for 2014, but narrowed the range on profit metrics due to the impact and uncertainty of egg white prices. The press release noted that the Company continued to expect net sales to be in the range of $540 million to $550 million. The press release added that Boulder was updating "its ***EBITDA outlook to be in the range of $89 to $91 million, from $89 to $94 million previously, and its earnings per share outlook to be in the range of $0.39 to $0.41, at the lower end of its previously stated $0.39 to $0.44 range***, primarily reflecting updated estimates for higher egg white prices for the remainder of 2014. In the press release, Defendant Hughes commented on the results and stated:

> While we continued to see strong sales momentum, our bottom line results were muted due to higher than expected egg white prices, which are an important ingredient in our gluten free bread business, as well as the mix shift to our Natural segment, which has lower gross margins. Regarding the higher egg white price

environment, we expect to somewhat offset the impact as we are in the process of improving our formulation, which requires less egg white. ***In addition, we have a number of margin improvement projects in process. As a result, we expect to see gross margins return to more normal levels in the back half.***

. . .***The Natural segment***, which includes Udi's, Glutino, and EVOL, represented 60% of our total net sales and ***reported a strong organic net sales increase of 39.5%. The segment continued to benefit from distribution gains across the brands***. We had top to top meetings with 10 of our top 20 accounts during the quarter and ***expect significant distribution gains across our natural portfolio in the second half. In addition, our Balance segment continued to execute on its core strategies during the quarter***. While organic net sales for the Balance segment declined 4.7%, brand profit continued to increase. Despite the difficult environment for spreads, we continue to lead the category in innovation with the transition to non-GMO, once again giving Smart Balance a significant point of differentiation in the category. Non-GMO Smart Balance is hitting the shelves now and will be fully converted by the end of the second quarter.

Overall, ***despite some short-term gross margin pressure***, we are pleased with the first quarter. ***I believe the stage is set for us to build on both revenue and margin. As we move from the first half of the year to the second half, we expect to begin to see the fruits of our efforts in terms of our margin improvement program and major distribution gains on our major sales initiatives*** – Project Gluten Freedom, Frozen Forward with Udi's and EVOL, and expansion into the Club channel.

* * *

***In the second half of the year, the Company expects to see a sequential improvement in gross margin due to operational improvements. Accordingly, the Company expects full year gross margin to be approximately 40% to 41%.*** Despite higher egg white prices, ***gross margin is expected to benefit from trade efficiencies, cost of goods reductions by improving its formula, and efficiency gains with its co-packers***. Additionally, we expect margin improvement in the UK and at Level as they lap start-up costs associated with product launches.

94. Subsequently, on May 8, 2014, Boulder issued a revised first quarter 2014 press release that was corrected to state that the Company expected sequential improvement in gross margins to 41% by the fourth quarter of 2014, rather than expecting gross margin of approximately 40% to 41% on a full-year basis.

95. After releasing its first quarter 2014 results on May 8, 2014, Boulder hosted a conference call to discuss the Company's first quarter earnings results. Defendants Hughes, Leighton and Sacco participated in the call on behalf of the Company, as did Buyers. As the call began, Defendant Hughes reiterated that the Company's margins were poised for expansion:

> Overall, ***despite some short-term gross margin pressure***, I feel very -- I'm very pleased with the number of positive developments in our first quarter. We had strong organic net sales growth of 18%, great momentum with our retailers and ***excellent progress on operations***.
>
> As a result, ***I believe the stage is set to build both revenue and margin throughout 2014*** **and into 2015.**
>
> * * *
>
> ***Our high-growth brands -- EVOL, Udi's and Glutino and Level -- each offer a wide range of margin-improvement opportunities as they scale in volume. Jim and his team have identified and are pursuing a range of low-hanging-fruit opportunities.***

96. Adding to his comments regarding margin growth, Defendant Hughes stated:

> ***As we move through the year and look into the future, I'm very confident that our margins will track the same positive growth path as our sales.***
>
> ***We remain confident in our long-term plan to drive organic sales growth from 10% to 15% and build EBITDA margins to 20%.***
>
> * * *
>
> Due to the -- looking at the April volumes we are seeing, ***we are confident that we're on track to deliver results in line with our plan and guidance.***

97. Describing why the Company's gross margins were under short term pressure, Defendant Hughes pointed to higher egg white prices and Boulder's "mix shift to our Natural brands."

98. Defendant Sacco, however, assured investors that margin would improve in 2014 and stated, in part:

***Turning to our 2014 outlook, we are reaffirming our guidance but narrowing the range on profit metrics due to the impact and uncertainty of egg white prices. We continue to expect net sales to be in the range of $540 million to $550 million. However, given the higher-than-expected increase in egg white prices to date, we are fine-tuning our profit outlook to the lower end of the ranges.***

* * *

For the second quarter, given higher-than-expected egg white prices, we expect gross margin to be approximately 37% and net income similar to Q1. ***In the second half of the year, we expect to see a sequential improvement in gross margins, as operational improvements are expected to improve margin to 41% by the fourth quarter.***

***Despite higher egg white prices, we expect gross margin to benefit from a number of initiatives. The first is an improvement in our cost of goods, as we are in the process of improving our formulation, which requires less egg whites. This new formulation is in production, and when inventories flow through it will have a meaningful impact in Q3.***

*In addition,* ***we have launched a major margin improvement program. And its scale of our emerging brands -- Udi's, Glutino and EVOL -- provides us with a wide range of margin-improvement opportunities.***

99. As the call continued, Defendant Hughes added:

Third, ***we'll be revitalizing our spreads business and accelerating SKU productivity while maintaining strong profitability.*** We will complete the conversion to non-GMO Smart Balance spreads by the end of the second quarter. While we're not expecting a significant sales lift as a result of this move to non-GMO, it is an important step in the Boulder Brands (inaudible) to provide innovative, transparent and healthier food alternatives as we clearly once again differentiate our Smart Balance and the margarine/butter category.

* * *

***Finally, we expect to make investments to support the overall growth of ensuring greater operational capacity and efficiency across our organization, ultimately improving gross margins. In the near term, as we move from the first half to the second half, we'll begin to see the impact of our efforts. Our comprehensive margin improvement program should deliver meaningful improvement from 37% in the first quarter to the low [40%] by year end.***

100. Defendant Leighton then discussed Boulder's improvement and strength in customer service:

> We've already gained significant ground in this endeavor. Regarding our new Denver Florence Street facility. ***We've made tremendous progress stabilizing customer service. We are now at or above targeted service goals. We're also making progress in driving operational improvements in yield, efficiencies and quality across all of our facilities.***

101. Defendant Hughes also discussed the Company's guidance, stating "[T]he thing that I'm really - I sleep at night with is ***we've identified and put a couple of major margin-improvement initiatives into our guidance. But there -- with Jim and his team now fully engaged, that is a long list of margin-improvement opportunities that are not reflected in our guidance."***

102. On May 8, 2014, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended March 31, 2014, which reiterated the financial results in the May 8, 2014 press release. The 10-Q, which reiterated the financial results in the press release, was signed by Defendants Hughes and Sacco, and contained SOX certifications signed by each of them.

103. The above statements from the Company's May 8, 2014 press release, conference call, and Form 10-Q filed with the SEC were materially false and misleading and omitted material facts because:

(a) The Company was continuing to experience significant problems in its Natural segment, including the lack of a basic warehouse management system at a key storage and distribution facility used by Boulder, as Defendants would later admit, which led to overproduction of inventory, raw material failures during production, and ultimately, an inability to accurately and timely distribute products to fulfill customer orders, including those of the Company's largest customer, UNFI;

(b) As a result of ongoing problems in the Natural segment and the withdrawal of support for Smart Balance, the Company was not poised to "build on both revenue and margin" and it was misleading for Defendants to point to margin improvement projects to claim that the Company expected to see a "sequential improvement in gross margin," and that full year gross margin would reach 41% by the end of 2014;

(c) Boulder had not "made tremendous progress stabilizing customer service" or made "progress in driving operational improvements in yield, efficiencies and quality across all of the Company's facilities," which Defendants subsequently admitted. Indeed, during the Class Period, key Boulder facilities were operating above maximum capacity, and the Company utilized a key storage and distribution facility that operated without a basic warehouse management system, and Boulder was unable to fulfill customer orders, including those of the Company's largest customer, UNFI;

(d) Boulder was not "revitalizing [the] spreads business and accelerating SKU productivity while maintaining strong profitability," but had instead intentionally pulled support from the Smart Balance business in favor of lower margin Natural products, as Gamgort would later admit. As a result, Defendants' statements regarding the outlook for Smart Balance sales and their commitment to revitalize and maintain strong profitability in the brand failed to paint an accurate picture of the then-current state of Smart Balance, as well as the future financial performance of the key brand;

(e) In light of the foregoing, Defendants' statements regarding the Company's 2014 financial guidance and outlook lacked a reasonable basis when made; and

(f) The Company's Form 10-Q for the first quarter of 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described herein.

### D. Defendants' False and Misleading Statements and Omissions from August 7, 2015 through October 21, 2015

104. On August 7, 2014, Boulder issued a press release announcing its financial results for the second quarter ended June 30, 2014. The press release stated in part:

> ***The Company reaffirmed its previously stated 2014 guidance. The Company continues to expect net sales to be in the range of $540 million to $550 million, adjusted EBITDA to be in the range of $89 to $91 million, and its earnings per share to be in the range of $0.39 to $0.41***.
>
> * * *
>
> ***Additionally, as previously guided, gross margin is expected to improve sequentially to 41% by the fourth quarter due to operational improvements.***

105. The press release quoted Defendant Hughes as stating, in part:

> We executed our plan in the quarter and ***we are on track to reach our full year targets***. While first half profits continue to be muted due to elevated egg-white prices and the mix shift to Natural, ***we are experiencing strong sales momentum and anticipate significant margin improvement and further distribution gains from our core initiatives in the second half.*** Importantly, we now have egg-whites locked in for the duration of the year.
>
> The Natural segment, which includes Udi's, Glutino, and EVOL, represented 61% of our total net sales and reported a strong organic net sales increase of 34.8%. Our Balance segment organic net sales increased 1.4%, and brand profit and brand profit margin for the Balance segment both increased in the second quarter. Our transition to Non-GMO spreads is complete and Smart Balance Spreads are now entirely non-GMO across all accounts. In addition, Earth Balance continues to have momentum in the spreads category and conventional retailers are looking to expand Earth Balance placements. Overall, I'm pleased with our progress. ***The combination of continued strong organic growth and a rebound in gross margins should result in a strong finish to 2014."***

106. After releasing its second quarter 2014 results on August 7, 2014, the Company hosted a conference call. Defendants Hughes, Leighton and Sacco, as well as Buyers, participated in the call on behalf of the Company. During the call's opening remarks, Defendant Hughes assured investors that margins would improve because of price increases and less reliance on egg whites, while also stating, in part:

> Regarding mix shift, over the past three years we've transformed our business from primarily the established Smart Balance spreads to a diverse growing portfolio in the Natural food space. Udi's and EVOL are early-stage brands and ***while gross margins today are below our corporate average, work is underway to leverage the emerging scale of these brands and improve margins materially in coming quarters.***
>
> ***The stage is set to build both net sales and margins throughout the second half of 2014 and into 2015. As we move through this year, and look to the future, we are confident that our margins will track the same positive growth path as our sales.***

107. Discussing the Balance segment in his opening remarks, Defendant Hughes added:

> ***Moving to the Balance segment, Smart Balance, Earth Balance and Level, total organic net sales increased 1.4% while consumption declined 7.2%***, including the impact -- excluding the impact of milk. ***The growth in net sales is partially the result of decline in some of our couponing programs which we determined did not have a meaningful impact on long-term velocities.*** Despite the continued challenge in the spread category, Earth Balance continues to be a bright spot with net sales growth of 18% and consumption growth of 17.3% in the quarter.
>
> Given Earth Balance's strong roots in the Natural channel, conventional retailers are beginning to view Earth Balance not as a spread but as a plant-based alternative to butter. ***We expect to see expanded distribution on Earth Balance at conventional retailers over the next 12 months.***

108. Defendant Sacco discussed that the Company's gross margin "was 35.7% in the second quarter, a decline of 610 basis points." Sacco added that the gross margin declined in both the Natural and Balance segments during the second quarter 2014.

109. Defendant Sacco also offered an explanation - based on past customers' shorting - as to why Boulder had increased its inventories, stating, in part:

> With respect to the balance sheet, one item to note. We invested $9.3 million in inventory in the second quarter and $8.2 million in the first quarter for a total of $17.5 million year-to-date. ***Recall at the end of 2013, we had out of stocks and missed sales due to inventories that were too low. We have now built them back up to an appropriate level for our business which is reflected in our case fill levels that are currently at 99%.***

110. Defendant Sacco again reaffirmed the Company's 2014 guidance and offered EPS breakdowns for the third and fourth quarters of 2014:

> ***Regarding our outlook, we are reaffirming our guidance for the year. We continue to expect net sales to be in the range of $540 million to $550 million; organic net sales growth in the 13% to 18% range, with the Natural segment expected to come in at the high end of the range of 25% to 30%; and Balance to be flat to slightly positive. Adjusted EBITDA to be in the range of $89 million to $91 million, EBITDA (technical difficulty) to be in the range of $79 million to $81 million and EPS to be in the range of $0.39 to $0.41 per share based on 64.1 million shares outstanding.***
>
> ***Regarding the quarterly flow of earnings for the back half, for the third quarter, we expect earnings per share to be in the range of $0.10 to $0.12 per share and the fourth quarter to be in the range of $0.18 to $0.20 per share. In addition we still expect gross margin to improve to 41% by year-end from an average of 37% in the first half of 2014 or approximately a 400 basis point improvement.***
>
> ***As we move from the first half to the second half of the year, we will begin to see the impact of our comprehensive margin improvement program.***
>
> ***Four key areas should contribute to the overall improvement in gross margins.***
>
> ***First, the majority of the improvement will come from the reduction of inefficient trade and coupon spending as we are gaining efficiencies with our retailers across our brands.*** Second, effective in Q3, we will begin to feel the benefit of the price increase on Udi's bakery we implemented to offset the higher egg white costs. Third we reformulated our ingredient profile which is now less dependent on egg whites. ***And finally we have a number of operational initiatives as we focus on continuous improvement projects that are already beginning to contribute to margin enhancement.***

111. As the call continued, Defendant Hughes added that the Company was committed to "***revitalizing our spreads business and accelerating SKU productivity, while importantly maintaining strong profitability.***"

112. During the question and answer portion of the call that followed, Defendant Hughes again touted the Company's growth in margins and stated, in part, ***"we're on track to get our gross margins solidly over 40% going forward. And there is a lot of margin improvement. . . overall, we really feel that with the team we have in place that we should be looking to be solidly over 40%."***

113. When a KeyBanc Capital Markets Inc. analyst asked for insight into "the gross margin bridge" and how the Company intended to move forward from lighter than expected margins to fourth quarter guidance of 41%, marking a "significant recovery" backed into guidance, Defendant Sacco responded, in part:

> ***So the 400 basis points we've got in for first half versus second half, is really going to be driven by three things. The first, and the majority, so more than half of the basis point improvement is going to come from our reduction of inefficient trade spend, the conventional promotion pricing model just not working. We're going to move to fewer bigger, better events.***
>
> We've had reformulations with our Udi's bakery products that have improved the product performance and in connection with the egg white movement we've also taken price on Udi's bakery items. That'll kick in in the third quarter. ***And then just the continuous margin improvement which is -- of the three initiatives contributing the least to the margin improvement, but there are -- every day there's a new item on that project challenge list.***

114. When the analyst also asked for confirmation that the Company's reduced trade spending was not expected to have a materially negative impact on growth, Defendant Hughes responded, ***"Exactly."***

115. Also on August 7, 2014, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2014. The 10-Q, which reiterated the financial results in the press release, was signed by Defendants Hughes and Sacco, and contained SOX certifications signed by each of them.

116. Defendants' false and misleading statements on August 7, 2014 as detailed above, created the illusion of a strong outlook and convinced analysts to maintain a "Buy" rating on the stock. For example:

(a) SunTrust Robinson Humphrey issued a report and maintained a "Buy" rating on the stock based on Boulder's reiteration of guidance, stating: "More importantly, we are now entering a period of margin expansion (led by COO Jim Leighton's initiatives), lower trade spending, and recent price increases."

(b) RBC Capital Markets issued a report stating that "near-term improvement in gross margins from trade efficiencies and pricing should help drive earnings delivery in the near-term."

(c) William Blair and Company remained positive about Boulder's portfolio, noting that the Company was "poised to support sustained double-digit organic growth. And from a margin perspective, the elimination of inefficient trade promotion, select price increases, product reformulation, and productivity initiatives support management's target for gross margin to reach 41% by year end."

(d) Canaccord Genuity also issued a positive report on Boulder, stating that "We continue to believe that Boulder Brands has a favorable financial model and platform for growth . . ."

(e) Imperial Capital, LLC also maintained a positive view of Boulder's financial prospects based on: "1) continued strong consumption trends in the gluten free, EVOL, and Earth Balance product lines, and 2) a clear path to higher margins based on scale, supply chain efficiencies

and SG&A leverage. We continue to believe the Smart Balance conversion to non-GMO could be a source of upside in 2H14."

117. Then, on August 13, 2014, Defendants Leighton and Sacco attended the Canaccord Genuity Growth Conference on behalf of the Company. During the conference, Defendant Sacco commented on the spreads category stating, in part:

> So, the spreads category has declined modestly in recent years, primarily due to rising oil costs. As a result we have, as well as others in the category, have taken price and that has largely resulted in volume declines in the category. However, it is that pricing coupled with the modest investments on the capital side for this business for us. ***It is 100% co-packed, along with management's commitment to manage this business more profitability, that has enabled us to fuel the growth in our natural channel.***

118. The above statements from the Company's press release and conference calls on August 7, 2014 and August 13, 2014, and the August 7, 2014 10-Q were materially false and misleading and omitted material facts because:

(a) The Company had not built up inventory "to an appropriate level" for Boulder's business, but was instead experiencing surging inventories as a result of the lack of a basic warehouse management system at a key facility, as Defendants subsequently admitted, which led to an inability to fulfill orders at its largest customer, UNFI;

(b) Boulder was not "revitalizing [its] spreads business and accelerating SKU productivity, while importantly maintaining strong profitability," and had not made a commitment to manage [the] business more profitability" [sic], but had instead intentionally pulled support from Smart Balance in favor of lower margin Natural products, as Gamgort would later admit. As a result, Defendants' statements regarding the outlook for Smart Balance sales and their commitment

to revitalize and maintain strong profitability in the brand failed to paint an accurate picture of the then-current state of Smart Balance, as well as the future financial performance of the key brand;

(c) Any savings that resulted from reduced trade spend also had the effect of reducing the Company's sales in light of the pulling of support from Smart Balance, and would have a materially negative impact on growth;

(d) The Company's "reduction of inefficient trade and coupon spending," which Boulder represented as one element of its margin improvement initiatives, did not result in higher margins, but instead had a materially negative impact on Boulder's growth;

(e) As a result of ongoing problems in the Natural segment and the withdrawal of support for Smart Balance, it was misleading for Defendants to point to margin improvement projects to claim that the Company expected to see full year gross margin reach 41% by the end of 2014;

(f) Boulder had not made any progress in stabilizing customer service or in driving operational improvements in yield, efficiencies and quality across all of the Company's facilities, which were operating above maximum capacity, yet unable to fulfill orders;

(g) In light of the foregoing, Defendants' statements regarding the Company's 2014 financial guidance and outlook lacked a reasonable basis when made; and

(h) The Company's Form 10-Q for the second quarter of 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described herein.

## VI. THE TRUTH IS REVEALED

119. On the morning of October 22, 2014, Boulder shocked investors when it announced its preliminary third quarter 2014 financial results. Among other things, the press release revealed that the Company was taking a significant impairment charge related to Smart Balance, that Boulder would report a loss per share that would fall significantly short of the EPS guidance repeatedly reaffirmed by Defendants during the Class Period, and that margins would not reach the levels consistently touted by Defendants. More specifically, the press release provided the following financial guidance:

- For the third quarter of 2014, the Company expects net sales to be approximately $133.9 million, an increase of 13% over the third quarter of 2013.
- Organic net sales increased approximately 8% and organic consumption growth increased approximately 12%.
- *Adjusted EBITDA for the third quarter of 2014 is expected to be approximately $21 million.*
- *GAAP diluted loss per share for the third quarter of 2014 is expected to be approximately $(2.12) after giving effect to the impairment charges detailed below. Excluding certain items, non-GAAP diluted earnings per share for the third quarter of 2014 is expected to be approximately $0.08 compared to prior guidance of $0.10 to $0.12.*
- For the fourth quarter of 2014, the Company expects net sales to be in the range of $132 to $137 million.
- *Adjusted EBITDA for the fourth quarter of 2014 is expected to be in the range of $18 to $20 million.*
- *Non-GAAP diluted earnings per share for the fourth quarter of 2014 is expected to be in the range of $0.04 to $0.06 compared to prior guidance of $0.18 to $0.20.*
- *In addition, we are anticipating preliminary estimated non-cash goodwill and trade name impairment charges aggregating $147.5 million relating to the*

> *Smart Balance business, of which a significant portion will not be tax deductible.*

120. In the October 22, 2014 press release, Defendant Hughes disclosed that "[d]uring the third quarter, we faced a number of headwinds that impacted our financial results. Smart Balance continued to face challenges in the spreads category, resulting in a larger than expected decline." The press release further quoted Defendant Hughes as stating that "the mix shift of our fast-growing, lower margin Natural segment is significantly outpacing our higher margin Balance segment and is therefore putting increased pressure on our gross margins." Finally, Defendant Hughes revealed the Company was "***expecting lower shipments due to a normalizing of certain inventories at our largest customer***."

121. On this news, the price of Boulder stock collapsed 23.64%, falling from a closing price of $12.73 on October 21, 2014 to close at $9.62 on October 22, 2014, on volume of more than 9 million shares traded. The next day, the stock dropped an additional 6.55%, closing on October 23, 2014 at $8.99, on volume of more than 5.3 million shares traded.

122. After the surprising October 22, 2014 announcement, the Company went into a quiet period until reporting its third quarter results on November 6, 2014. On November 6, 2014, after the Class Period, the Company issued a press release announcing its finalized financial results for the third quarter ended September 30, 2014. In addition to repeating the financial results set forth in the October 22, 2104 press release, this press release provided in part:

- During the third quarter of 2014, net sales of Smart Balance continued to decline more than the category. Given the stronger trends and unique positioning with Earth Balance, the Company has made the strategic decision to substitute Earth Balance for under-performing Smart Balance items, and has lowered its long-term projections for Smart Balance. As a result, the Company recorded impairment charges to goodwill and the Smart Balance trade name of $150.5 million, of which $113.5 is not tax deductible.

- The Company's operating loss was $138.1 million in the third quarter of 2014 after giving effect to the Smart Balance impairment charges. Adjusted EBITDA for the third quarter of 2014 was $20.9 million. GAAP diluted loss per share for the third quarter of 2014 was $(2.17) after giving effect to the impairment charges noted above. Excluding certain items, non-GAAP diluted earnings per share for the third quarter of 2014 were $0.08.

- As previously announced, for the fourth quarter of 2014, net sales are expected to be in the range of $132 million to $137 million; adjusted EBITDA is expected to be in the range of $18 million to $20 million; and non-GAAP diluted earnings per share is expected to be in the range of $0.04 to $0.06 per share.

- The initial outlook for the full year 2015 is as follows: Net sales are expected to be in the range of $575 million to $585 million; Gross margin is estimated to be in the 36% to 37% range, EBITDA is expected to be in the range of $78 million to $82 million; and diluted earnings per share is expected to be in the range of $0.25 to $0.29, based on 64 million shares outstanding.

123. The press release included the following statement by Defendant Hughes concerning the Company's negative performance:

> *We are also realigning our inventory management practices with respect to our largest customer in order to be more consistent with the rest of our customer base, which will be a drag on our fourth quarter results.*

124. After releasing its third quarter 2013 results on November 6, 2014, the Company hosted a conference call to discuss Boulder's financial results for the third quarter 2014. Defendants Hughes, Leighton and Sacco, as well as Buyers, participated in the call on behalf of the Company. During the call Defendants revealed for the first time that the Company suffered from service issues in its Natural segment, with Defendant Hughes stating, in part:

> The headwinds we faced in the third quarter include challenges in the spreads category, and *service issues in our natural segment. This negatively impacted our sales and even more so our profitability*, given a mix shift towards our faster growing, but lower margin natural segment, and the categories within it. *As a result, we will not meet our goal of 41% gross profit for the physical year end.*

125. Defendant Sacco then provided further detail about the Company's negative financial results stating, in part:

> Gross margin for the total Company was 37.7% in the third quarter, a decline of 300 basis points versus last year. *The gross margin decline was primarily related to the negative mix shift impact from the high margin Smart Balance brand to the natural segment brands.* This impact was compounded within the natural segment, since EVOL is our the [sic] fastest growing brand, yet has the lowest margins today. While the increase in egg white pricing had a total of 190 basis point hit to gross margin, this was partially offset by higher capacity utilization at our Florence Street facility, and egg white reduction from reformulation.
>
> * * *
>
> *Turning to our fourth quarter and full year 2014 outlook, we have reduced our expectations to reflect the reduction of sales from Smart Balance, and expected inventory reduction at our largest customer. As a result, net sales are expected to be in the range of $132 million to $137 million. Adjusted EBITDA is expected to be in the range of $18 million to $20 million, and non-GAAP diluted EPS expected to be in the range of $0.04 to $0.06 per share.*
>
> *For the full year, we now expect net sales to be in the range of $520 million to $525 million, adjusted EBITDA to be in the range of $74 million to $76 million. EBITDA to be in the range of $64 million to $66 million, and EPS to be in the range of $0.22 to $0.24 per share based on 64 million diluted shares outstanding. In addition, we expect gross margin for the full year to be approximately 37%.*

126. Defendant Hughes also acknowledged that the Company's rapid expansion through acquisitions hurt Boulder's operations and profitability:

> As you know we made a number of acquisitions over the past few years, which resulted in sales diversification, and a stronger portfolio of brands.
>
> *While positive strategic or long-term moves, these acquisitions have put a short-term strain on our operations. We are intently focused on integrating these businesses, and instilling disciplined processes across our operations, so we can continue to pursue our growth strategy that will likely include future acquisitions.*

127. As the call continued, Defendant Hughes shed light on the Company's Smart Balance brand, stating part:

> Now let me discuss the challenges we are experiencing. While net sales increase 13%, organic net sales increased 8.4% in the quarter. *Sales growth moderated due to accelerated declines of Smart Balance, as well as an impact from service issues in our natural segment.*
>
> Regarding Smart Balance, despite our non-GMO launch, the negative trends in spreads -- the spread categories continued, as we have not seen a widespread lift in our sales due to the non-GMO launch. Although we continue to believe that it's the right move for us as a Company, with respect to delivering on our mission, vision, and principles. Chris will address the impairment, and I will review our strategy on Smart Balance and Earth Balance spreads, when I speak about our outlook later in the call.
>
> * * *
>
> Unfortunately to date, non-GMO Smart Balance spreads do not significantly offset the challenges in the spreads category, and overall Smart Balance spreads would decline beyond our previous expectations. *As a result, we have transitioned to a strategy to include swapping out underperforming Smart Balance items with Earth Balance items, and pivoting the position of both Smart Balance and Earth Balance to dairy-free butter, which we will explain later in the call.*

128. As the call continued, Defendant Sacco revealed additional facts regarding Boulder's customer service issues that had negatively impacted profitability and hurt margins stating, in part:

> Regarding the service issues in our natural segment, Jim will provide more detail later, but let me provide you with a brief overview. Throughout 2014, we experienced rapid growth in EVOL and Udi's. Consumption on these two brands combined was up 43% in the third quarter, which has increased the complexity of our business. Distribution gains on Udi's and EVOL have been very strong and extremely uneven. These distribution gains are often large and are timed with retailers' resets, which can put added strain on our logistics network from time to time.
>
> In order to improve everyone's service levels with our customers, we made the decision to realign our inventory management product practices with respect to our largest customer, in order to be more consistent with the rest of our customer base. This initiative will be complete by the end of the fourth quarter.

129. Further discussing the extent of the Company's service issues, Defendant Leighton revealed that Boulder had again shorted key customers, was unable to fulfill open orders with its

largest customer, and that a key facility utilized by both Udi's and EVOL lacked a basic warehouse management system. Specifically, Defendant Leighton stated, in part:

> By the end of the third quarter, inventory patterns stepped up with our largest customer. This prevented shipments from getting out of the door uniformly. In addition, EVOL and Udi's utilize the same frozen third-party distribution center, which has served the two companies well as stand-alone entities. *But as a combined company with significantly more volume and distribution complexities, we simply exceeded [the distribution center's] capacity and capabilities to properly service our customers in Q3. As a result, we did not fill all open orders with our largest customer, and shorted other key customers resulting in lower sales and poor service levels.*
>
> To remedy this, we expect to rebalance our inventory's weeks on hand with our largest customer, and are implementing a new internal supply and demand process, that will more evenly spread distribution throughout the weeks, months and quarters so we don't see this disruption again. We are also undertaking an intensive review of how we manage our logistic and distribution systems, and are working with our Denver third-party distribution center to improve performance.

130. When a Canaccord Genuity analyst asked about the Company's service issues and inventory adjustment, including how Boulder "failed to meet some open orders from your largest customer" but was "reducing inventory at your largest customer," Defendant Leighton revealed that UNFI, Boulders' largest customer, had excess inventory and explained:

> Yes, the big picture, if you look back over the last few quarters, our shipments and consumption have been fairly in line with each other. *But we are experiencing significant distribution gains, and have been shipping a lot of new products, particularly in frozen in Udi's. And UNFI has been holding levels of inventory beyond where our consumption has been.* So generally sales in consumption are tracking somewhat in line. But we did see a gap widen, and made it conscious of a decision to lower our inventories.
>
> And this is really an extension of getting our supply chain in order. And specifically the facility that I referenced in the earlier comments is a legacy facility that both EVOL and Udi's used. *To put it in perspective, this facility doesn't have even have a warehouse management system.* So these are the things we are upgrading across the entire system. And in the third quarter, *we just simply did not have the capacity and capability to get enough orders out of that facility, which impacted all of our customers, including UNFI.*

131. As the call continued, Defendant Hughes explained that the "inventory got ahead of itself" and the customer shorting was a result of "really exceed[ing] our capability of getting products out."

132. Further, Defendant Sacco revealed that the integration of the Company's acquisitions had negatively impacted performance, when she admitted that "*putting these four businesses together, and trying to get them on a platform for this kind of rapid growth was too ambitious, and it caught us*." This statement was contrary to the repeated assurances made during the Class Period that the Company "initiated a comprehensive strategic review to ensure we have the integrated strategies, processes, and operations in place to keep up with our growth, and then take steps to ensure we have the people end of the structure to keep pace."

133. Boulder never recovered. The Company was never able to effectively integrate its acquisitions, stabilize Smart Balance, or see a quick recovery in sales. To that end, on June 10, 2015, Defendant Hughes stepped down as CEO and the Company issued a press release providing a ***negative outlook*** for the second quarter of 2015, ending June 30, 2015, including "a ***reduction in sales trends***" by approximately 5% to 7% compared to second quarter of 2014; as the Natural Segment is estimated to be flat to an increase of 2% and the Balance Segment is estimated to decline 16% to 18% from a year earlier.

134. Between the significant pre-announced shortfall and the abrupt CEO departure, shares of Boulder stock plummeted $1.97 or 22%, from a close of $8.88 on June 9, 2015, to a close of $6.91 on June 10, 2015 after the negative announcements.

135. Then, on July 8, 2015, the Company announced significant layoffs as part of a restructuring "to better align functional teams, improve the Company's operational effectiveness and

deliver improved and consistent results." The restructuring included executive officer and management changes and a reduction in salaried employees by approximately 15%.

136. When Pinnacle Foods held its conference call on November 24, 2015 to announce its acquisition of Boulder, Gamgort revealed additional, startling facts that contradicted Defendants' Class Period statements regarding Boulder's Smart Balance brand:

- [T]he most challenged business in [the acquisition] has been the Smart Balance segment;

- *[A] lot of support has been pulled from that brand* and it was extended into a number of segment[s] to get away from its true core benefit. And there's a real opportunity to return it to its core benefit, core formats and restore support behind it;

- We see the foundation brand, which is Smart Balance, has a real opportunity for us to reinvigorate an iconic brand. It has been challenged;

- *[T]here's been a dramatic reduction in support behind this brand* that is a huge contributing factor . . . . It's getting it to the right SKUs. It's about getting the distribution and the pricing right. *And it's about restoring some support to it*; and

- This is part of that portfolio optimization opportunity that we talked about here. And I think that means pairing this business down to really the strong SKUs, reemphasizing the benefit to consumers in a strong way and *actually restoring some support on this business, which have been pulled very dramatically in the past number of years.*

137. These statements by Gamgort confirmed that the decline in Smart Balance resulted from Defendants' conscious decision "in the past number of years" to "very dramatically" pull support away from Smart Balance, which caused accelerated sales declines during the Class Period.

## VII. BOULDER WAS REQUIRED TO DISCLOSE NOT ONLY THAT IT WAS STILL EXPERIENCING CUSTOMER SERVICE ISSUES THAT PREVENTED IT FROM FULFILLING ORDERS AND THAT IT WAS DRAMATICALLY REDUCING SUPPORT FOR SMART BALANCE, BUT ALSO THE IMPACT SUCH EVENTS WOULD HAVE ON THE COMPANY'S BUSINESS

138. During the Class Period, Boulder filed Forms 10-Q and 10-K with the SEC. As detailed herein, these filings failed to disclose material information required to be disclosed pursuant to controlling SEC rules and regulations.

139. The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

140. Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (*i.e.*, Forms 10-Q and 10-K), among other things:

(i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

141. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

142. Defendants violated the affirmative disclosure duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period: (i) Boulder had ongoing customer service issues, including the lack of a basic warehouse management system at a critical storage and distribution facility used for Udi's and EVOL products, that left the Company unable to deliver the proper ingredients for manufacturing products led to an overproduction of products, and prevented the Company from fulfilling customer orders, including orders by its largest customer, UNFI; (ii) Boulder's customer service issues also stemmed from the Company's inability to successfully and fully integrate its acquisitions; (iii) Boulder had deliberately removed significant support from Smart Balance and, therefore, materially weakened the Company's ability to stabilize sales and maintain brand profitability; and (iv) the combination of these ongoing events would adversely affect the Company's current business, as well as its future revenues, gross margins, and growth prospects.

143. The foregoing concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] material affect[ing] the amount of reported income from continuing operations."

## VIII. LOSS CAUSATION

144. As detailed throughout and further herein, Defendants' fraudulent scheme artificially inflated Boulder's stock price by failing to disclose: (a) the conscious decision to turn support away from Smart Balance in favor of the Company's Natural segment and Earth Balance; (b) the true scope of the Company's warehouse inventory management and customer service deficiencies; (c) the inability of Boulder to improve margins to 41% by year end; (d) that the customer shorting issues which plagued the Company in 2013 remained unresolved; and (e) that the Company had failed to adequately integrate its acquisitions, which rendered Defendants' financial outlook unattainable. Defendants' false and misleading statements, individually and collectively, concealed Boulder's pervasive manufacturing deficiencies, ongoing customer service shortcomings, and the Company's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about Boulder was revealed. While each of these misrepresentations was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate Boulder's stock price and the image of its future business prospects to give the

market the false notion that Boulder's manufacturing operations were strong, consistently improving, and profitable, and that the Company's rapid growth story remained intact. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. Indeed, Defendants' false and misleading statements had the intended effect and caused, or were a substantial contributing cause of, Boulder's stock trading at artificially inflated levels, reaching as high as $17.94 during the Class Period.

145. A truer picture of Boulder's operational and financial circumstances was revealed on October 22, 2014, when Defendants revealed significant sales declines in the Smart Balance business, an impairment charge related to its Smart Balance business, the mix shift in its segments to the lower margin Natural Segment, and lower shipments of products due to problems with inventories at its largest customer. When Boulder provided the market with these revelations on October 22, 2014, it was an indication to the market that Defendants' prior Class Period statements were false and misleading.

146. On this news, the price of Boulder stock collapsed 23.64%, falling from a closing price of $12.73 on October 21, 2014 to close at $9.62 on October 22, 2014, on volume of more than 9 million shares traded. The next day, the stock dropped an additional 6.55%, closing on October 23, 2014 at $8.99, on volume of more than 5.3 million shares traded.

147. In sum, the rapid decline in the price of Boulder stock following the Company's October 22, 2014 disclosure was a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market. Thus, the revelations of truth at the close of the Class Period and thereafter, including the additional disclosures of

information on November 6, 2014, as well as the resulting clear market reaction, support a reasonable inference that the market understood that Defendants' prior statements were false and misleading and omitted material information. In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged, suffering true economic losses.

148. Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff as a result of the October 22, 2014 stock price decline, were a direct and proximate result of Defendants' scheme and misrepresentations and omissions that artificially inflated Boulder's stock price and the subsequent significant decline in the value of Boulder's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## IX. PRESUMPTION OF RELIANCE

149. A Class-wide presumption of reliance is appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

150. A Class-wide presumption of reliance is also appropriate in this action under the fraud-on the market doctrine. As a result of Defendants' materially false and misleading statements,

the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Plaintiff and other members of the Class purchased or otherwise acquired Boulder's publicly traded common stock relying upon the integrity of the market price of the common stock and the market information relating to Boulder, and have been damaged thereby when the artificial inflation was removed.

151. At all relevant times, the market for Boulder's stock was an efficient market for the following reasons, among others:

(a) Boulder's stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Boulder regularly made public filings, including its Forms 10-K, Forms 10-Q, and related press releases with the SEC;

(c) Boulder regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d) Boulder was followed by several securities analysts employed by major brokerage firms, such as William Blair & Company, Canaccord Genuity, and KeyBanc Capital Markets Inc., among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large. Each of these reports was publicly available and entered the public marketplace.

152. As a result of the foregoing, the market for Boulder common stock promptly digested current information regarding Boulder from all publicly available sources and reflected such information in the prices of Boulder common stock.

153. Under these circumstances, all purchasers of Boulder common stock during the Class Period suffered similar injury through their purchase of Boulder common stock at artificially inflated prices and losses suffered when the artificial inflation was removed, and a presumption of reliance applies.

154. At the times they purchased or otherwise acquired Boulder common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

155. In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's common stock traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Plaintiff and the other members of the Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

## X. NO SAFE HARBOR

156. The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Boulder who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XI. PLAINTIFF'S CLASS ACTION ALLEGATIONS

157. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of Boulder between December 23, 2013, and October 22, 2014, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the

officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

158. Because Boulder has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ, members of the Class are so numerous that joinder of all members is impracticable. According to Boulder's SEC filings, as of shortly after the start of the Class Period, Boulder had approximately 60 million shares outstanding. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

159. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

160. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class it seeks to represent.

161. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

162. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f) whether the market prices of Boulder's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Boulder's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## XII. COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

163. Plaintiff repeats and realleges the allegations set forth above in ¶¶1-162 as though fully set forth herein. This claim is asserted against all Defendants.

164. During the Class Period, Boulder and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiff, and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Boulder common stock; and (iii) cause Plaintiff and other members of the Class to purchase Boulder common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Boulder and the Individual Defendants, and each of them, took the actions set forth herein.

165. These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Boulder common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Boulder, as alleged below.

166. In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information

that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, product marketing and promotion, financial condition, and operational performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

167. Boulder and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, sales performance, product marketing and promotion, operations, and future prospects of Boulder as specified herein.

168. These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Boulder's financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Boulder and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Boulder's common stock during the Class Period.

169. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (i) the Individual Defendants were high-level executives at

the Company during the Class Period; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers, were privy to, and participated in, the creation, development, and reporting of the Company's internal sales and marketing plans, projections, and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

170. Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing Boulder's operating condition, sales, product marketing and promotional practices, and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the Individual Defendants' overstatements, misstatements, and omissions of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

171. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Boulder common stock were artificially inflated during the Class Period. In ignorance of the fact that market prices of Boulder common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Boulder common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

172. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, sales, marketing, promotion, and other fraudulent business practices, future prospects, and intrinsic value of Boulder, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Boulder common stock during the Class Period; or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

173. By virtue of the foregoing, Boulder and the Individual Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

174. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales

of the Company's common stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from Boulder stock.

## XIII. COUNT II: FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

175. Plaintiff repeats and realleges the allegations set forth above in ¶¶1-162 as though fully set forth herein. This claim is asserted against the Individual Defendants.

176. The Individual Defendants acted as controlling persons of Boulder within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

177. In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

178. As set forth above, Boulder and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange

Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Boulder common stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from Boulder common stock.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

(a) Declaring that this action is a proper class action and certifying Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court deems appropriate.

## XV. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 1, 2016

*s/ Rusty E. Glenn*

RUSTY E. GLENN
THE SHUMAN LAW FIRM
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
FAX: (303) 536-7849
E-mail: rusty@shumanlawfirm.com

*Local Counsel*

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE
ROBERT J. ROBBINS
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
FAX: (561) 750-3364

*Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 1, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record and paper copies will be sent to those indicated as non-registered participants via First Class U.S. Mail.

*/s/ Rusty E. Glenn*
RUSTY E. GLENN