**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 15-cv-00679-MSK-KMT**

**OKLAHOMA POLICE PENSION & RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated,**

 **Plaintiff,**

**v.**

**BOULDER BRANDS, INC.,
STEPHEN B. HUGHES,
JAMES B. LEIGHTON, and
CHRISTINE SACCO,**

 **Defendants.**[1]

_____

**OPINION AND ORDER OVERRULING OBJECTIONS, ADOPTING RECOMMENDATION, AND GRANTING MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiffs' ("OPPRS") Objections **(# 59)** to the Magistrate Judge's March 1, 2017 Recommendation **(# 56)** that the Defendants' Motion to Dismiss **(# 46)** be granted.

**FACTS**

The Court summarizes the pertinent allegations here and elaborates as necessary in its discussion. Defendant Boulder Brands, Inc. ("Boulder") is a manufacturer and distributor of food products primarily sold at retail. Since 2007, it has sold a variety of margarines, oils, spreads, and related products under the trade name of "Smart Balance." Until 2011, Smart Balance products were Boulder's primary source of revenue, account for 70% or more of its net

---

[1] The Court has *sua sponte* amended the caption of this case to properly reflect the identity of the Plaintiff as a result of the Court's March 2, 2016 Opinion and Order Granting Motion to Consolidate and Appoint Lead Plaintiff **(# 36)**.

sales. In 2012, however, Boulder acquired several other subsidiaries, including entities that produced various baked goods and other products, many of which were pitched at the gluten-free market, under trade names such as "Udi's" and "EVOL." Those and similar products are generally referred to as Boulder's "Natural" unit (as opposed to the Smart Balance unit). Since that time, products in the Natural unit have become more prominent sources of Boulder's revenue, and Smart Balance sales dropped to about 30% of Boulder's overall revenues.

Plaintiff OPPRS, on behalf of a putative class of Boulder shareholders, alleges that Boulder made numerous false statements and misleading omissions when speaking about its business from December 23, 2013 to October 22, 2014.[2] The alleged false statements and omissions can generally be grouped into two categories. First, OPPRS alleges that Boulder mislead investors during 2014 by promising to shore up sales in the high-margin Smart Balance unit. OPPRS alleges that, in actuality, Boulder was knowingly diverting promotional spending and attention away from Smart Balance products in favor of the lower-margin products in the Natural unit, and focusing more on emerging promotional channels like social media instead of the traditional television and coupon advertising that Boulder had previously relied upon to reach Smart Balance's older customer demographics. OPPRS alleges that the Boulder "effectively abandoning Smart Balance" in 2014 was partly the cause of Boulder falling short of third-quarter 2014 revenue expectations, a fact that was revealed to the market on October 23, 2014, causing Boulder's stock price to drop by more than 25%.

The second category of false statements is somewhat more diffuse, but centers around Boulder's efforts to incorporate the acquisition of popular brands like Udi's and EVOL into its existing business. Demand for these products apparently surged in 2014, such that Boulder's

---

[2] For ease of reference, the Court will usually refer to this time frame as "2014."

Range Street manufacturing facilities for them were forced to run above the maximum capacity for extended periods of time. While this might ordinarily be cause for celebration, OPPRS alleges that this caused Boulder to mis-allocate its resources, such that an uneven mix of products were produced. The demands also exposed flaws in Boulder's Oneida Street warehouse, which was ill-equipped to handle both the increased demand for delivery of raw materials to the manufacturing facilities and the storage and distribution of finished products. The net result of these difficulties was that Boulder sometimes failed to fully satisfy orders being placed by its customers, a practice known as "shorting." Boulder has also experienced unspecified difficulties with its customer service team in 2013 and was in the midst of attempting to fix those problems when the manufacturing and warehousing issues arose in 2014, which OPPRS alleges further exacerbated the problem. Cumulatively, these problems also affected Boulder's revenues in the third quarter and contributed to the disappointing third-quarter 2014 results. OPPRS alleges that Boulder failed to disclose the various difficulties it was having, including failing to disclose that its antiquated warehouse and absence of a modern inventory system. As a result, investors were mislead into accepting Boulder's rosy profit expectations and promises during 2014 to focus its efforts on certain projects and improvements that would improve Boulder's profit margins, projects that Boulder had declared were "low-hanging fruit" that could be quickly accomplished.

Based on these allegations, OPPRS asserts claims for: (i) securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j; and (ii) control person liability against the individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t. The Court ultimately consolidated several actions brought by Boulder shareholders into this case and appointed OPPRS as the lead Plaintiff.

The Defendants moved **(# 46)** to dismiss OPPRS' claims pursuant to Fed. R. Civ. P. 12(b)(6). The Court referred that motion to the Magistrate Judge for a Recommendation. On March 1, 2017, the Magistrate Judge recommended **(# 56)** that the Defendants' motion be granted. Specifically, the Magistrate Judge found: (i) OPPRS' Amended Complaint was an improper "puzzle pleading" in violation of Fed. R. Civ. P. 9, although the Magistrate Judge declined to recommend dismissal based simply on this defect; (ii) that most of the statements by Boulder alleged by OPPRS to be misleading were forward-looking statements (although a handful were mixed statements of present fact and future projection); (iii) all of the statements in question were accompanied by sufficient cautionary statements, and thus non-actionable under the PSLRA's "safe harbor" provision, 15 U.S.C. § 78u-5; (iv) OPPRS failed to plead facts showing that the person making any of the statements knew them to be false at the time they were made; (v) Boulder's statements regarding its focus on Smart Balance's profitability were "non-actionable puffery" and did not create any duty to disclose additional information; (vi) Boulder's statements about its customer service improvements were accurate statements of historical successes and thus non-actionable; (vii) OPPRS failed to plead facts supporting its contentions that the Individual Defendants made false certifications under the Sarbanes-Oxley Act; and (viii) OPPRS failed to adequately plead facts supporting its contention that the Defendants violated "Item 303." 17 C.F.R. § 229.303(a)(3)(ii).

OPPRS filed timely Objections **(# 59)**, arguing: (i) the Magistrate Judge failed to account for the handful of statements that she determined were not forward-looking, and that those statements alone would be sufficient to support the securities fraud claims; (ii) the Magistrate Judge did not draw all reasonable inferences in OPPRS' favor when interpreting the significance of post-October 22, 2014 statements, as such statements (when supported by favorable

inferences) would demonstrate the falsity and misleading nature of Boulder's statements during 2014; (iii) Boulder's statements concerning its margin-improvement projects were not protected forward-looking because they omitted non-favorable information known to Boulder, namely the warehousing and production difficulties that were occurring; (iv) the Magistrate Judge erred in finding that Boulder's "boilerplate" cautionary disclaimers were sufficient to bring Boulder within the "safe harbor" provision; and (v) the statements concerning Smart Balance were materially misleading.

## ANALYSIS

### A. Standard of review

The Court reviews the objected-to portions of the Recommendation *de novo*. Fed. R. Civ. P. 72(b).

OPPRS has not disagreed with the general standards the Magistrate Judge applied, and the Court adopts them here. Under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded allegations in the Amended Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001). A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face," but the Court must discard allegations that are merely legal conclusions or "threadbare recitals of the

5

elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009).

Because OPPRS asserts claims of fraud subject to the Private Securities Litigation Reform Act ("PSLRA"), it bears an especially heavy pleading burden. It must satisfy Fed. R. Civ. P. 9(b)'s requirement that acts of fraud must be pled with particularity. Moreover, it must satisfy the pleading requirements of the PSLRA, which require it to: (i) specify each statement alleged to have been misleading; (ii) explain the reasons why the statement is misleading; and (iii) if the allegation is made upon information and belief, state the factual basis for that belief. 15 U.S.C. § 78u-4(b)(1); *In re Gold Resource Corporation Securities Litig.*, 776 F.3d 1103, 1108-09 (10th Cir. 2015). Allegations of scienter are subject to even more requirements: OPPRS cannot allege scienter generally, and must state particular facts giving rise to a strong inference of scienter with respect to each act or omission, taking into account plausible, non-culpable alternative explanations for a defendant's conduct along with inferences that favor the plaintiff. *Id.* at 1109; 15 U.S.C. § 78u-4(b)(2).

### B. Merits

To state a claim for securities fraud, OPPRS must show: (i) that a defendant made a representation of fact that was untrue or misleading, or failed to state additional material facts that were necessary to make a statement by the defendant not misleading; (ii) the statement or omission was made in conjunction with the sale of securities; (iii) the defendant acted with scienter, meaning the intent to defraud or with reckelessness; (iv) that OPPRS relied upon the misleading statements, and (v) that it suffered damages as a result. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

Before proceeding to OPPRS' specific arguments, this Court pauses to echo – and perhaps amplify – the Magistrate Judge's finding that OPPRS' pleadings are needlessly voluminous. To be sure, Rule 9(b) and the PSLRA subject securities fraud plaintiffs to exacting pleading requirements. At the same time, Fed. R. Civ. P. 8 requires that a complaint be a "short and plain statement" whose assertions are "simple, concise, and direct." *Arena Land & Inv. Co. v. Petty*, 906 F.Supp. 1470, 1476 & n. 5 (D.Ut. 1994).

The Amended Complaint runs afoul of Rule 8 in several respects. At 69 substantive pages and 178 paragraphs of allegations, it is a hefty document in and of itself. But large amounts of that heft are unnecessary summaries and recapitulation, boilerplate, and simply excess verbiage. The first 13 paragraphs, accounting for nearly 5 pages of text, is a "Summary of the Action" that is repetitive of more detailed allegations and would be rendered entirely unnecessary by more concise and focused pleading. Paragraphs 23-30, amounting to an additional 3 pages, are purely boilerplate allegations that the individual defendants, as officers of Boulder, "were privy to confidential and proprietary information," "had access to non-public information," "are liable as direct participants," and dozens of other purely conclusory assertions. The same is true of paragraphs 149-161 (more than 5 pages of boilerplate regarding presumptions of reliance, the inapplicability of safe harbor protection, and class action allegations), and the statements of the claims (5 pages of purely boilerplate recitation of elements).

The operative allegations are also presented in a confusing and indirect manner, as OPPRS recites the pertinent factual events in a straightforward (if somewhat wordy) manner, but does not interleave the pertinent false statements or omissions at the pertinent points in the chronology. Instead, it saves those statements for a separate section that consists of a seemingly

endless list of quoted press releases, conference call transcripts, 10-K filings, and various other materials. OPPRS sets forward portions of these quotations in boldface text, but it is not at all clear whether the bolded statements are those that OPPRS alleges are specifically fraudulent or misleading, or whether the bold text is simply highlighting statements that are significant to OPPRS' general themes (and if the latter, how the Court should distinguish the actionable statements from those that are highlighted only for effect).[3] The sequential presentation of all pertinent events, followed by all challenged statements, not only muddles the chronology and makes for more difficult reading, it also introduces additional repetition, as OPPRS is forced to periodically break from its endless parade of quotes to sum up, referring back to the historical recitation to explain the significance of the quoted material. *See e.g.* ¶ 88, 103. 118. These summaries would be unnecessary if the allegations regarding the false statements were meaningfully incorporated into the historical recitation itself.

These and other defects combine to produce a document that unambiguously violates Rule 8, yet does little to advance the purposes of Rule 9 or the PSLRA. Boilerplate recitations or cumulative quotations do not substitute for clear, precise pleading of key statements and the facts that illustrate how those statements are misleading. This Court is not as sanguine as the Magistrate Judge that these defects should be overlooked, simply because the Court is able to "tease out the most relevant statements" (much less that it is only able to do so thanks to "guidance from the Plaintiff"). OPPRS' counsel have previously touted their experience in complex securities litigation and their "reputation for excellence." *Docket #* 29 at 6-7. Thus, it should not take heroic efforts by the reader to understand the key factual components of the

---

[3] OPPRS' briefing invokes fewer than a dozen specific statements by Boulder, rather than each and every of the 100+ statements donts rendered in bold text in the Amended Complaint. At best, then, OPPRS' pleading is needlessly cumulative in its recitation of actionable statements.

plaintiff's claims, or to sort the meaningful allegations from pages upon pages of chaff. Accordingly, this Court would dismiss the Amended Complaint *sua sponte* for failure to comply with Rule 8, even if, as discussed below, it would not dismiss it on substantive grounds as well.

   1. Allegations relating to Smart Balance unit

The Court turns first to those allegations that Boulder made misleading statements or omissions regarding its promotional efforts on behalf of the Smart Balance unit. In general, OPPRS alleges that Boulder misleadingly claimed it "was committed to maintaining strong profitability" in the Smart Balance unit, when, in reality, it was "dramatically removing critical support" from the product line.

In a conference call in February 2014, Boulder addressed its "strategy" for Smart Balance, stating that "we'll focus on stabilizing our spreads business while maintaining strong profitability in that segment."  Asked to elaborate on that point, Boulder explained "we're going to be moving Smart Balance from what I would call [a] conventional marketing model, which is 10%, 12% of net revenue kind of spending with mass TV advertising . . . to really the Udi's marketing model, which in more in the 5% to 6% range."  In other words, Boulder informed investors that it would be <u>decreasing</u> its promotional spending on Smart Balance, albeit focusing more on different promotional channels.  OPPRS states that "an analyst expressed concern over . . . whether that would accelerate the decline of the brand" and Boulder responded again that its goal was "to maintain the profitability" of Smart Balance, and that "if we can find a way to effectively change the trend line, we'll do that."  It continued, "we don't think we're putting the trend line at risk with this change in marketing strategy,"[4] because, in its experience with using

---

[4] The Amended Complaint does not hint at what the "trend line" was. Given that Smart Balance sales had been shrinking in significance since 2011, that analysts were describing "the

9

the same strategy for the Udi's line, such a tactic "[is] lower dollars [but] extraordinarily effective in building that brand." Later, it explained again that "what we're seeing in terms of trends, we don't think vast marketing is the way to spend our dollars anymore" with regard to Smart Balance, noting that it had already begun throttling back its promotional spending and "really haven't seen any change in trend" with regard to sales as a result. OPPRS points to various other statements by Boulder over the ensuing months that repeated Boulder's commitment to maintaining Smart Balance's "profitability" and importance.

The key October 22, 2014 announcement of third-quarter expectations – which OPPRS characterizes as "the truth com[ing] out" – revealed that, among other things, "net sales of Smart Balance continued to decline more than the category," and that Boulder would react by shifting focus to its better performing Earth Balance spreads. OPPRS alleges that the clearest indicia that Boulder's statements about Smart Balance in 2014 were false was a November 2015 statement by Robert Gamgort, CEO of an entity that had recently acquired Boulder. Mr. Gamgort stated that "a lot of support has been pulled from [the Smart Balance] brand" over an unspecified period of time, and "there's been a dramatic reduction in support behind this brand" (which Mr. Gamgort promised to restore).

The Court finds these allegations are insufficient to demonstrate that Boulder made any false or misleading statements or omissions about its activities (much less its forward-looking intentions) regarding Smart Balance. Boulder unambiguously told investors in February 2014 that it was reducing its promotional spending on Smart Balance, although it expected that diverting the reduced spending to different platforms would help maintain, if not actually

---

decline of the brand," and Boulder was referring to "stabilizing" it, it would seem that the "trend line" in question was one that was steadily falling.

10

improve, Smart Balance's competitive position. OPPRS makes much of Mr. Gamgort's[5] opinion that Boulder had "pulled support" from Smart Balance over the years, but even that statement confirms exactly what Boulder told investors in February 2014: Boulder was pulling back on promotional spending on Smart Balance, hoping that fewer dollars spent differently could produce the same or better effects than more dollars spent on traditional promotional campaigns. Moreover, Mr. Gamgort's statement is tantalizingly ambiguous: it does not describe what exactly the "support" is that he believes Boulder withheld from Smart Balance. In other words, it is not clear whether Mr. Gamgort is opining that Boulder provided Smart Balance inadequate advertising support, whether it failed to give the brand sufficient logistical or distribution support (such as attempting to expand the brand's placement in stores or geographic availability), whether he is referring to support among corporate officers for the brand or its niche, or some other kind of "support." Even assuming that Mr. Gamgort's version of "support" maps to OPPRS' allegation that "support" means "promotional spending," Mr. Gramgort's statement is still temporally ambiguous. It describes Boulder's withdrawal of support for Smart Balance as occurring over "the past number of years," but does not define that time frame more specifically. This is problematic for OPPRS, as this "number of years" could be 2014-2015 – such that this loss of support occurred entirely within the class period, as OPPRS seems to contend. Or Mr. Gamgort could be speaking of an extended period, such as 2011-2015, a period of time in which Boulder's lack of support for Smart Balance might explain its decreasing significance to Boulder's brand portfolio. Without clarification of Mr. Gamgort's meaning, the Court cannot

---

[5]   It is certainly difficult for OPPRS to rely on Mr. Gamgort – an outsider to Boulder expressing what appears to be an <u>opinion</u> about what Boulder had done at a time when he was not involved – to establish a fact that Boulder's officers knew of a certain <u>fact</u> at a certain <u>time</u>. Fortunately, the Court need not consider that matter to reach the outcome here.

conclude that OPPRS has plausibly alleged that Boulder suddenly and unexpectedly withdrew significant promotional support for Smart Balance in 2014 alone.[6]

The Court need not belabor the analysis of the Smart Balance issue significantly. It is clear that the Amended Complaint fails to adequately allege facts that would show that Boulder made false or misleading statements or omissions regarding its diminishing support for Smart Balance, much less the strong inference of scienter that is necessary under the PSLRA.

2. Allegations relating to warehousing, customer service, etc.

As noted above, OPPRS' second strand of allegations concerns allegations that Boulder misled investors about its operational abilities in 2014, by failing to disclose that it was experiencing warehousing, supply chain, and customer service difficulties.

Given the pleading deficiencies noted above, the Court declines to work through the dozens of bolded quotes in the Amended Complaint in order to collect the alleged statements relevant to this strand of claims. Instead, the Court will rely on the Recommendation and OPPRS' Objections to point towards the most significant statements.

(a) Margin-improvement opportunities

---

[6] One of OPPRS' arguments in support of its Objections is that the Magistrate Judge erred in not appropriately viewing Mr. Gamgort's statement and Boulder's November 2014 statements in the light most favorable to it. There is a fundamental difference between drawing reasonable inferences in the light most favorable to the plaintiff on a Rule 12 motion and having to defer to a plaintiff's conclusory or arbitrary interpretation of the evidence.
  *Iqbal* makes clear that although the Court draws reasonable factual inferences in favor of the plaintiff, it is not required to accept the plaintiff's conclusions as to what the allegations demonstrate. 556 U.S. at 678. And *Gold Resource* explains that, in addition to drawing "inferences favoring the plaintiff," the Court must consider both "plausible, non-culpable explanations" for a set of affairs. 776 F.3d at 1109. Ultimately, the plaintiff bears to burden of pleading facts showing that "the inference of scienter [is] at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Thus, it is not enough for OPPRS to simply propose an interpretation of the facts that favor it; it must show that this inference is at least as strong as any innocent explanations. *See Iqbal*, 556 U.S. at 681 (plaintiff's allegations must nudge[ ] his claims . . . across the line from conceivable to plausible").

12

First, the Magistrate Judge found that the bulk of the statements OPPRS relied upon were protected as forward-looking under the PSLRA's safe-harbor provision. But the Magistrate Judge found three specific statements that were "mixed" statements of existing fact and future projection: (i) a statement that "we have a lot of low-hanging fruit on margin improvement" that could be exploited; (ii) that "gross margin is expected to benefit from trade efficiencies, costs of good reductions by improving formula and efficiency gains with its co-packers"; and (iii) that "our high-growth brands . . . offer a wide range of margin-improvement opportunities as they scale in volume." OPPRS first argues that, because the Magistrate Judge found those statements to not be protected as forward-looking, they alone would preclude dismissal.

OPPRS does not argue that the quoted statements are themselves false – that is, it does not contend that Boulder did not have certain margin improvement targets it considered to be "low-hanging fruit" or that its high-growth brands did not offer a range of margin-improvement opportunities. Instead, it argues that these statements were rendered misleading by Boulder's failing to acknowledge that, at the same time it was promoting margin-improvement efforts, its "main distribution facility suffered form then-existing operational failures." It is somewhat difficult for the Court to ascertain how one statement affects the other: a company can capitalize on opportunities to increase its margins in some respects despite having long-standing operational failures in a different part of the business. The absence of a warehouse management system is simply a permanent drag on company growth potential, much like a jogger running against a headwind: just as the jogger can still accelerate into the wind, even if doing so might cost her more energy than if the wind were not present, the warehousing defects would not seem to necessarily prevent Boulder from increasing its margins by exploiting the available opportunities, even if the warehouse defects made those margin increases less dramatic than they

13

might otherwise have been. Certainly, OPPRS has not pled facts that suggest that the margin-improvement opportunities Boulder targeted were <u>impossible</u> to achieve without first fixing the warehouse problems. Thus, the Court cannot say on these facts that the failure to disclose warehouse problems when discussing margin-improvement opportunities would have tended to mislead investors.

Moreover, as the Magistrate Judge noted, to the extent that Boulder identified the lack of a warehouse management system as a cause for its failure to improve margins, that failure appears to have manifested itself late in the third quarter of 2014. In the November 2014 conference call explaining the third quarter results, Bolder stated "<u>by the end of the third quarter</u>, inventory patterns stepped up with our largest customer [which] prevented shipments from getting out of the door uniformly" because of insufficient facilities. ¶ 129 (emphasis added). Even assuming that Boulder was under an obligation to disclose the warehouse defects when speaking of its margin-improvement plans, OPPRS has not identified when the warehouse defects actually manifested themselves to Boulder, such that Boulder's failure to disclose that problem became a knowing or reckless falsehood. As such, OPPRS has not pled facts that give rise to a strong inference of scienter in this regard. Accordingly, the Court agrees with the Magistrate Judge that allegations involving these alleged omissions fail to state a claim.

(b) <u>Customer service issues</u>

The Magistrate Judge also addressed certain statements by Boulder about its efforts to improve its customer service abilities. The Amended Complaint is vague about the nature of the customer service problems, stating only that "customer service and shorting issues [ ] had plagued the company in 2013." In the February 2014 conference call, Boulder announced that "we had to get our arms around – quickly around customer service. So we built up the

14

capabilities and capacities to support that. And happy to tell you now that we have customer service levels where they need to be." OPPRS seems to equate the nebulous reference to "customer service levels" with instances in which Boulder "shorted" a customer on an order. Thus, it points to that same conference call where Boulder explained that "we really have seen our service levels get back to the standard we want to see over the last month and a half. So, we don think the shorting issue's going to be there going forward." On other occasions, Boulder again touted making "tremendous progress stabilizing customer service." OPPRS contends that, contrary to Boulder's statements, the defects at the Oneida warehouse continued to result in customers being shorted during 2014.

Once again, the Court has some difficulty in understanding why OPPRS believes that Boulder's statements about improving its customer service capabilities are somehow misleading. OPPRS does not allege that these statements are false: that Boulder did not actually build up its capabilities as it said. Rather, OPPRS appears to suggest that because Boulder's failure to disclose the defects in the Oneida facility – defects that resulted in customers continuing to get shorted – continued to occur, Boulder's touting of its customer service improvements were somehow rendered misleading. These allegations fail for essentially the same reasons above. Even assuming that concepts of "increasing customer service capabilities" and "shorting" are somehow in direct opposition, such that the existence of one establishes the absence of the other, the record reflects that the shorting began to occur "late in the third quarter" when customer demand overwhelmed the Oneida facility's ability to keep up. It is not clear when, precisely, this occurred, nor is it clear from the Amended Complaint that Boulder touted its customer service capabilities after that date. Thus, OPPRS has failed to adequately allege both misleading via omission and the Defendants' scienter. The Court further agrees with the Magistrate Judge that,

in large part, Boulder's statements about its customer service improvements are also nothing more than "accurate reporting of historical successes,"[7] and thus, non-actionable.

### (c) Other statements

A fair reading of OPPRS' Objections reveals that it also contends that certain additional statements by Boulder are actionable. It points to a May 8, 2014 statement by Boulder concerning its first-quarter results, in which Boulder stated that "despite some short-term gross margin pressure, . . .. I believe the stage is set to build both revenue and margin throughout 2014 and into 2015." OPPRS also points to Boulder making specific projections as to its expected profit margins it made during the February 2014 conference call. *Docket* # 59 at 6 & n. 2. It argues that these statements were false and misleading because, at the time Boulder made them, it knew that the Oneida facility could not track products and manage inventory, that the Range facility was suffering from production problems, that Boulder was withdrawing support from the Smart Balance unit, and that its rapid growth was straining operations.

To some extent, the preceding discussion addresses most of these issues: allegations of customer orders overwhelming warehouse capabilities "late in the third quarter" does not make statements made before that date misleading, and Boulder did not mislead investors about its intentions concerning the Smart Balance unit. As to the remaining issues, OPPRS has not carried its burden of alleging facts that demonstrate that Boulder's margin projections were <u>actually</u> false (that is, that Boulder did not subjectively have the expectations it was announcing) or that the expectations were misleading by omission. For example, OPPRS has not alleged that

---

[7] The possible exception is the statement in February 2014 that, because customer services has been improved, "we don't think the shorting issue's going to be there going forward." Although such a statement is not historical, it <u>is</u> a statement of present expectation, and OPPRS has not pled any facts that reveal that as of February 2014, Boulder knew that increased demand would overwhelm the Oneida facility and cause additional shorting.

production difficulties at the Range facility alone made Boulder's expectations unrealistic; indeed, the Amended Complaint alleges that during the time period at issue, the Range facility was exceeding "the theoretical maximum capability of production," was "over-producing," and that production there was "virtually constant." ¶ 51 & n. 6. Although OPPRS alleges that overworking the Range facility caused it to suffer various "mechanical and logistical problems," it does not allege that the frequency and severity of those problems was such that Boulder was unrealistic in projecting margins based on the level of production that was then-occurring. Thus, for the same reasons above, the Court finds that OPPRS has failed to adequately allege that these statements were false or misleading, or plead facts showing the Defendants' scienter.

(d) <u>Remaining matters</u>

OPPRS' Objections contend that the Magistrate Judge erred in finding that many of the challenged statements were forward-looking and accompanied by adequate cautionary disclaimers. In light of the foregoing discussion, in which the Court finds that OPPRS has failed to adequately plead how the statements discussed above were false or misleading or made with sufficient scienter, it does not appear necessary for the Court to proceed to consider whether the Magistrate Judge was correct in finding that the statements would be subject to the PSLRA safe harbor provisions in any event.

The Magistrate Judge also reached conclusions rejecting OPPRS' allegations concerning false Sarbanes-Oxley certifications and "Item 303" issues. OPPRS' Objections do not appear to take issue with the Magistrate Judge's rulings on these points, and the Court therefore adopts the recommendation as to them.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** OPPRS' Objections **(# 59)** and **ADOPTS** the Recommendation **(# 56)**. The Defendants' Motion to Dismiss **(# 46)** is **GRANTED** and OPPRS' claims **DISMISSED** in their entirety.[8] The Clerk of the Court shall modify the caption of this action to reflect that used in this Order, and thereafter shall close this case.

Dated this 28th day of March, 2017.

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge

---

[8] OPPRS has not requested, and thus the Court does not reflexively grant, leave to amend to cure any pleading deficiencies. If OPPRS believes that it can nevertheless plead a colorable claim in light of the discussion above, it is free to move to reopen the case and seek leave to amend.